1

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                      CASE NO.:   09-21514-BKC-EPK
 3

 4     In Re:

 5     TERRY R. EICHAS

 6
            Debtor.
 7     _____/

 8

 9

10     DEPOSITION OF:              TERRY R. EICHAS

11     TAKEN AT INSTANCE OF:       The Trustee

12     DATE:                       September 1, 2009

13     TIME:                       2:04 p.m. - 4:58 p.m.

14     PLACE:                      222 Lakeview Avenue
                                   Suite 800
15                                 West Palm Beach, Florida

16

17

18

19

20

21

22

23

24                 SUN COAST REPORTERS
                    P. O. Box 221164
25          West Palm Beach, Florida 33422
                    (561)640-9621
```

2

```
 1   APPEARANCES:

 2   On behalf of the Trustee:

 3   MICHAEL BAKST, ESQUIRE
     Ruden, McClosky, Smith, Schuster & Russell
 4   222 Lakeview Avenue, Suite 800
     West Palm Beach, Florida  33401
 5
     On behalf of the Debtor:
 6
     STEVEN G. GOERKE, ESQUIRE
 7   McRae Law Offices, P.A.
     5300 West Atlantic Avenue, Suite 412
 8   Delray Beach,  Florida  33484

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

INDEX

EXAMINATION

Witness Name                                              Page
TERRY R. EICHAS
    Direct By Mr. Bakst ................................. 4

EXHIBITS

Exhibit                                                   Page
Trustee's No. 1 Marked for Identification                9
Trustee's No. 2 Marked for Identification                70
Trustee's No. 3 Marked for Identification                70
Trustee's No. 4 Marked for Identification                79
Trustee's No. 5 Marked for Identification                79
Trustee's No. 6 Marked for Identification                94

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The deposition of TERRY R. EICHAS taken at the

2    instance of The Trustee, on oral examination, pursuant to

3    notice, commenced at 2:04 p.m., on September 1, 2009, at

4    222 Lakeview Avenue, West Palm Beach, Florida before

5    Janice L. Mamino, Notary Public in and for the State of

6    Florida at Large.

7          It was stipulated and agreed by and between

8    counsel for the respective parties that the reading and

9    signing of the deposition by the witness be waived.

10                         - - -

11   WHEREUPON,

12                    TERRY R. EICHAS

13   after being first duly sworn, was examined and testified

14   as follows:

15                   DIRECT EXAMINATION

16   BY MR. BAKST:

17        Q     Would you state your name and address for the

18   record?

19        A     Terry Eichas, 6926 Skyline Drive, Delray

20   Beach.

21        Q     Your zip code?

22        A     33446.

23        Q     Mr. Eichas, my name is Michael Bakst.   I'm an

24   attorney representing Deborah Menotte.   Miss Menotte is

25   the trustee in the Chapter 7 bankruptcy that you have

1    filed.   We are here today under Rule 2004 of the
2    Bankruptcy Code so that I can ask you questions about
3    your bankruptcy.

4              We are going to go through certain documents
5    with you today, your schedules, statement of financial
6    affairs.   I'm going to ask you general questions about
7    your bankruptcy.

8              This is a deposition like any other which
9    means it is under oath and under penalty of perjury.   If
10   you do not understand a question today, please tell me
11   you do not understand.   I'll then try to explain it so
12   that you do.   If you don't know the answer to a question,
13   there is nothing wrong with saying I do not know.
14   Otherwise whatever answer you give is the answer I will
15   assume is correct.

16             Please try to wait until I'm done speaking
17   before you respond.   I'll try and do the same with you.
18   That's because the court reporter can only take down one
19   person speaking at a time.   Also if an answer calls for
20   yes or no, try to respond verbally with yes or no.   If
21   you say uh-huh or nod your head, it's very difficult to
22   accurately take that down.   Do you understand everything
23   so far?

24        A    Yes.

25        Q    Have you ever filed bankruptcy before?

```
1      A      I have.
2      Q      When was your previous bankruptcy?
3      A      I believe it was 1992.
4      Q      Where did you file?
5      A      Broward County.
6      Q      What chapter did you file?
7      A      Seven.
8      Q      What caused that bankruptcy?
9      A      That one was caused from an accident and my
10  career change.  I was a harness horse race driver.  I was
11  in a racing accident.  I was hurt, laid up for over a
12  year and during that time, obviously no income but also
13  unable to go back into the sport immediately and just
14  caused time and just unable to work.
15     Q      What caused your present bankruptcy filing?
16     A      Economic conditions.
17     Q      Can you be a little more specific?
18     A      Income stopped about two and a half years
19  ago.  It didn't slow down.  It stopped.
20     Q      Just so we are clear, two and a half years
21  ago from today?  Today being September 1.
22     A      Roughly.  Exact date I can't tell you,
23  but from the end of the year of 2006, 2007 and 2008.  I
24  am a real estate broker and income has been next to
25  nil.
```

1          Q      Sometime around you are saying late '06?

2          A      Very late '06.

3          Q      Late '06 is when your income stopped?

4          A      Yes.  It stopped just permanently then.  I

5    haven't had any.

6          Q      How have you supported yourself then?

7          A      Pennies.

8          Q      What do you mean?

9          A      Just wherever.  There is -- once in awhile

10   there is a deal.  I think I have had probably in the

11   office six deals this year.

12         Q      Being 2009?

13         A      2009.

14         Q      Okay.

15         A      Last year I don't believe we had that many.

16   It was that poor.  Whatever it is, is on the IRS

17   statement.  I had a lot of cash savings.  I went through

18   all of that.  I went through everything that I had.  I

19   also went back to training horses slightly and then that

20   quit.  We got notice in November last year that was going

21   to stop for the summer so that ended that career again.

22   I don't make much on that.  It's a couple hundred dollars

23   a week a horse, about a hundred dollars a week per horse

24   is what I make approximately.

25         Q      When did you fall behind on paying your

1  bills?

2      A    Less than two years ago, but it all happened

3  very quickly.  I think it was probably around the end of

4  '07 I believe.  I honestly don't remember, but it was

5  when it stopped, it stopped.

6      Q    Your income stopped late '06?

7      A    Yes.

8      Q    You paid your bills?

9      A    I kept using my cash thinking this would just

10 go away, and it just never did.

11     Q    When did you finally run out of your

12 savings?

13     A    I think October two years ago if my

14 recollection is correct.  That's the time that I stopped

15 paying everything.  I didn't have any more funds to

16 pay.

17     Q    October '07?

18     A    That would sound probably correct.

19     Q    Why did you wait so long to file

20 bankruptcy?

21     A    I keep trying.

22     Q    I'm sorry?

23     A    I keep trying to make things work, but it has

24 gotten to the point now where I can't do anything.

25     Q    Let me show you and I'll hand your attorney a

1    copy of what I'm going to mark Exhibit 1 which appears to

2    be a copy of your schedules and statement of financial

3    affairs, also your petition in bankruptcy.  I need for

4    you to review that.  Tell me if you can identify that and

5    if this is a true and correct copy of what it purports to

6    be?

7                   MR. GOERKE:  That appears to be the

8           schedule.

9                   THE WITNESS:  Okay.

10                  (Whereupon, Trustee's Exhibit Number 1 was

11          marked for identification.)

12   BY MR. BAKST:

13          Q     Do you recognize these pages?

14          A     This is information I gave Steve, yes.

15          Q     Did you read these pages before you signed

16   them?

17          A     I don't think I scrutinized every page.  I

18   believe I gave him the information, and we actually -- if

19   I'm not mistaken, we did this together.

20                  MR. GOERKE:  Yes.  Well, he's asking you

21          questions.

22   BY MR. BAKST:

23          Q     Did you read your schedules and statement of

24   financial affairs before you signed them?

25          A     To the best of my ability I did, yes, and

1    comprehension.

2        Q      Are they accurate?

3        A      To the best of my ability, I believe they

4    are.

5        Q      Let's start with why don't we go to Schedule

6    A.    It's page eight of forty-six.

7        A      Uh-huh.

8        Q      Are you at that page?

9        A      Yes, I am.

10       Q      This is where you list all of the real

11   property that you owned on the day you filed bankruptcy.

12   I need you to look at this and tell me if this is correct

13   as of the day you filed bankruptcy?

14       A      That is.

15       Q      That's all of the real property that you

16   owned?

17       A      That I'm aware of, yes.

18       Q      Does this accurately convey your ownership

19   interest, the nature of your ownership interest?

20       A      That I'm the sole owners of those?

21       Q      We will go through 6926 Skyline Drive.    It

22   says you own a hundred percent of that.

23       A      Correct.

24       Q      You value it at five hundred eighty-three

25   thousand dollars.

1      A      Uh-huh.

2      Q      Is that correct value you believe?

3      A      At this time, yes.

4      Q      How did you arrive at that value?

5      A      I believe that was an assessed value.  I do

6   know from that area that the value would be somewhere

7   between that and six hundred, six twenty-five at best at

8   this particular time.

9      Q      Is it on the market to be sold?

10     A      It is not.

11     Q      There is mortgages on that of over one point

12  one million dollars; is that correct?

13     A      Correct.

14     Q      How did you borrow that much money against

15  this property?

16     A      This property originally was purchased at

17  eight hundred fifty or eight seventy-five.  I put over

18  half a million dollars in repairs in it.  At one point I

19  believe the value was up to one point four.  That's what

20  I had involved in it and refinanced out.

21     Q      What did you do with the money when you

22  refinanced it?

23     A      Probably paid off what I owed on it getting

24  the half million dollars into it.

25     Q      Now you believe it is only worth about six

1   hundred or six twenty-five?

2       A       The market has gone in half.

3       Q       It's not on the market; right?

4       A       Not at this time.

5       Q       When is the last time it was on the market?

6       A       It was on the market -- I'm not going to

7   remember the exact date.  I'm going to say up to the

8   beginning of this year or the very late end of last year,

9   and what was happening was it would end up being a short

10  sale with a different bank, second behind so it was a

11  complicated situation.  The value is not there and

12  nowhere near the value.

13      Q       What was the short sale price that you were

14  trying to get the bank to accept?

15      A       Trying to get nine hundred thousand, and that

16  was an impossibility.

17      Q       When is the last time you paid the

18  mortgage?

19      A       I believe it was October of '07, two years

20  ago.

21      Q       And you are still living there?

22      A       Yes.

23      Q       Has the bank -- have you heard anything from

24  the bank?

25      A       A long time ago they said keep it up.  That's

1    all they said.  That was from Sun Trust in the first

2    position.  The values have fallen out of the sky now so

3    at this point, it was just don't destroy it.

4         Q      There is a second mortgage on that

5    property?

6         A      Uh-huh.

7         Q      Is that yes?

8         A      Yes.

9         Q      That's in favor of Citibank?

10        A      Citibank, yes.

11        Q      What did you use the Citibank money for?

12        A      Probably still repairs.

13        Q      Repairs on the property?

14        A      The house when I bought it was in complete

15   disarray.  This is an airplane community.  The house had

16   water running through a roof.  It was two and a half

17   acres, very perfect situation for what I was in.  I had

18   other property in the middle of the state.  I was able to

19   charter a plane to go back and forth to the other office,

20   to this office and when it tumbled, it tumbled,

21   everything went.  I had another office in Avon Park at

22   that time both for title and for real estate.  It already

23   had been foreclosed on prior to the date, and that's why

24   it is not listed in the summary on A or on this

25   particular line.

1      Q      The other property?

2      A      The other property was 1210 State Road 64,

3  and that was a commercial property.  That was the home of

4  the office.

5      Q      That was foreclosed?

6      A      That was foreclosed I believe in May.

7      Q      What year?

8      A      '09.

9      Q      The sale occurred in May of '09, the actual

10  judicial sale?

11      A      It went back to Wells Fargo.

12      Q      There was an actual foreclosure sale?

13      A      Yes.

14      Q      Wells Fargo bid at the foreclosure sale or do

15  you know?

16      A      I don't, but they seem to have the property

17  in possession now because it's currently on the market.

18      Q      Do you know what it is listed at?

19      A      I honestly don't know.  I believe the agents

20  said they were listing it at two hundred sixty thousand

21  or one hundred sixty.  I don't know.  I guess that's the

22  better answer.

23      Q      You list property at 12742 Oak Run Court?

24      A      Yes.

25      Q      When was that purchased?

1       A       That was purchased in June of 2003.

2       Q       For how much?

3       A       It was purchased for three hundred eighty

4    some thousand dollars.

5       Q       Now you think it's worth three eighty-eight

6    current value?

7       A       Today it's worth less than that.  The house

8    across the street sold for three hundred twenty-five

9    thousand.  I would say it's probably closer to three

10   twenty-five at this point.

11      Q       Why do you list three eighty-eight on the

12   schedules?

13      A       At that time, that was more appropriate at

14   that particular date.

15      Q       This says held individually and as trustee.

16   Can you explain that to me?

17      A       I had a trust, a revocable trust, of whatever

18   year it originated, and that was put into the trust.

19   That was my primary at that particular time and,

20   therefore, it was put into a trust.  And this was advice

21   of an attorney that I use for personal.

22      Q       When you say it was your primary, what do you

23   mean by that?

24      A       Primary residence.

25      Q       You lived there sometime?

1        A        I lived there all of the time.

2        Q        From when to when?

3        A        2003 until 2006.

4        Q        Then you moved to Skyline?

5        A        To Skyline.

6        Q        Did you rent the property out once you moved

7    out?

8        A        I did not.

9        Q        Did you make the mortgage payments?

10       A        For quite sometime until October of '07.

11       Q        Why did you stop paying then?

12       A        I ran out of money.

13       Q        The mortgage on this is six hundred forty-one

14   thousand dollars?

15       A        Yes.

16       Q        It appears that the mortgage is held by

17   Citimortgage has a mortgage, Citibank has an equity line.

18   I think that's the only liens other than Oak Run

19   maintenance?

20       A        Home owners association.

21       Q        Have you tried to sell this property?

22       A        I have.

23       Q        For what asking price?

24       A        Asking price was -- I don't remember.  I had

25   it listed.  I had three cash offers turned down, all

1    three of three hundred seventy-five thousand cash.

2         Q      Three seventy-five?

3         A      Three seventy-five cash, and the bank

4    rejected it three times, three different offers.  At that

5    time, I gave up.  Every one of those deals that didn't

6    pass those people bought something else in that

7    community.

8         Q      It looks like you certainly have over two

9    hundred fifty thousand dollars borrowed against this

10   property over and above the purchase price?

11        A      Correct.

12        Q      What did you do with that money?

13        A      The first month to move in.  This was bought

14   off the steps, prior to the steps.  I think the repair on

15   the first month was over sixty or sixty-five thousand.

16   That house during that period of time did an extensive

17   back end patio, screen porch, heated pool, complete paint

18   inside, out.  It was in rough shape when I bought it.

19        Q      You spent about two hundred fifty thousand

20   dollars on repairs?

21        A      No.  I spent sixty some thousand the first

22   time, and then I added some things later on to it.

23        Q      How much did you spend later on?

24        A      I would say probably the total expenditure

25   was excess of a hundred thousand.

1      Q      What happened to the other hundred fifty

2  thousand?

3      A      Probably that was the second mortgage carried

4  over to Skyline which helped in that development.

5      Q      You think you spent a hundred fifty thousand

6  that you borrowed against this?

7      A      And went into the Skyline house.

8      Q      In addition to --

9      A      Well --

10     Q      -- the other moneys?

11     A      It's part of the money.  I believe I had a

12  million four tied up into Skyline when I got done the

13  first six months or first to six months of owning it.

14  And these funds helped to offset that.  At that

15  particular time, this house was listed at six

16  ninety-nine, and that was the market value at that time.

17  I sold the house down from a smaller one for seven

18  hundred ten and then the market fell out.  It didn't

19  sell.

20     Q      You list property at 2665 North Mulberry

21  Road?

22     A      Uh-huh.

23     Q      When did you buy that?

24     A      I bought that -- I'm going to tell you I

25  don't remember.  It was in the fall.  I believe it was

1    of -- it could have been '06.  It was under contract for

2    a long time.  It actually was purchased earlier that

3    year, and it was scheduled to close later in the fall.

4         Q    Fall '06 for how much money?

5         A    It was purchased for I believe ninety-two or

6    ninety-three thousand dollars.

7         Q    How much of that was financed?

8         A    I believe all of it.  There might have been a

9    small down on it.

10        Q    What is this property; a home?

11        A    It's a single family home.

12        Q    Why did you buy it?

13        A    I bought that and the one across the street.

14   They were in proximity of the office.

15        Q    Right.  Why?

16        A    They were actually going to be for

17   employees.

18        Q    What do you mean for employees?

19        A    At that time, we had quite a staff in the

20   real estate office, and I was going to have one of the

21   office managers live there.

22        Q    Did they ever live there?

23        A    No.  No one ever resided in that home.

24        Q    Why not?

25        A    The market stopped before we got into the

```
 1    swing of it.
 2         Q      Is anyone living there now?
 3         A      Not to my knowledge.
 4         Q      Has anyone ever lived in the property since
 5    you have owned it?
 6         A      No.
 7         Q      What is the condition of it?
 8         A      Livable.  It was clean.  It's a very old
 9    home.  It had central air, a washer and dryer.  It was
10    clean but dated.
11         Q      Has it been on the market to be sold?
12         A      It was until they turned down an offer.
13         Q      What was the asking price?
14         A      The asking price was -- I don't remember.
15    Maybe a hundred nine.
16         Q      When was that asking price?
17         A      Probably in the year 2007.
18         Q      Now you think it's worth fifty-three
19    thousand?
20         A      Yes.
21         Q      How did you arrive at that value?
22         A      The house across the street I paid a hundred
23    thousand for and sold that for sixty-four thousand.
24         Q      How long ago?
25         A      That sold in January -- February of '09.
```

1       Q     Who financed this property?

2       A     Which one?

3       Q     2665 North Mulberry.

4       A     It was financed by --

5       Q     I see Aurora Loan?

6       A     Aurora Loan Service, yes.

7       Q     Is that the lender or a servicer, if you

8 know?

9       A     I don't know.  I believe it's the lender.

10      Q     You list another property 2626 West Wellston,

11 W-e-l-l-s-t-o-n, Road?

12      A     Correct.

13      Q     This is vacant land?

14      A     Yes.

15      Q     Why did you purchase this?

16      A     I bought several lots looking to develop and

17 build homes there.

18      Q     Right.

19      A     And it never happened.

20      Q     How much did you pay for it?

21      A     This was inclusive of a lot.  This has two

22 lots.  It takes two lots to build.  I bought four lots

23 together.  I paid cash for them.  Forty-five thousand.

24      Q     You bought four lots together and this

25 consisted of two lots?

1          A     Correct.

2          Q     At forty-five thousand?

3          A     Yes.

4          Q     When?

5          A     I honestly don't remember.

6          Q     Approximately how many years ago?

7          A     Two to three, right when this boom was on.

8          Q     Where did you get the money from?

9          A     It was cash that I had at that time,

10   liquid.

11         Q     If it was two to three years ago, that would

12   indicate that you used cash at or around the time that

13   you were running out of money?

14         A     It would have been before then, but I can't

15   tell you the exact dates.  There is too much to try to

16   remember.

17         Q     Your ownership interest is yourself a hundred

18   percent?

19         A     Yes.

20         Q     You own that just under your name?

21         A     I do now.  It was originally purchased in a

22   corporation called BHTT.  I put up a hundred percent of

23   the money.

24         Q     It was originally purchased under a corporate

25   name.  Tell me that name again.

1      A     BHTT.

2      Q     What does that stand for?

3      A     It's the initials of four people.  It would

4 be Brent Hydn, Tiesha (phonetic) and myself.

5      Q     Spell Hydn.

6      A     H-y-d-n.

7      Q     H-y-d-n?

8      A     Uh-huh.  Tiesha.

9      Q     Spell it.

10      A     I'm unable to spell that.

11      Q     And Terry?

12      A     And Terry.

13      Q     Did you all put money into it?

14      A     I'm the only one that put the money up.

15      Q     Why did you put it in four people's names?

16      A     Hydn is a building contractor, was active

17 with me in that area.  He remodeled the original office,

18 did the build out on it.  He was also going to join me in

19 building up there and selling, and again it just hit the

20 end of the ropes, and it didn't happen.

21      Q     Did you ever market this property for sale?

22      A     We actually had plans.  We had submitted

23 plans to the county.  They were approved.  We couldn't

24 break ground.

25      Q     Why couldn't you break ground?

24

```
 1        A     Money.  At that time, it was the beginning of
 2    the end, and we stopped.
 3        Q     Originally it was under a corporate name
 4    called BHTT?
 5        A     Correct.
 6        Q     Was that BHTT, Inc.?
 7        A     Correct.
 8        Q     At some point, it went out of that name?
 9        A     Yes.
10        Q     When?
11        A     I'm going to say I believe it was last year.
12    I believe it was September is when we signed off
13    everything because we were not going to file another
14    year's income tax with it because there was no
15    activity.
16        Q     Why was it transferred to you initially?  Why
17    did the transfer occur?
18        A     Because I was the only one that put up the
19    money to it.
20        Q     Now it's owned by yourself under your name?
21        A     Yes.
22        Q     I understand you have given a mortgage to
23    Jerry McGue --
24        A     Correct.
25        Q     -- on this property; is that correct?
```

```
 1        A       Yes.

 2        Q       When did you give him a mortgage?

 3        A       Jerry held a second mortgage on 2650 Mulberry

 4   Road in the second position.  When we realized that the

 5   values were dropping so badly, he would get nothing out

 6   of a short sale completely, and I needed him to sign off

 7   to get that particular interest so I could sell that

 8   particular home.  I moved his interest to this

 9   property.

10        Q       When?

11        A       I'm going to say around the same time that we

12   did the transfer back from BHTT.

13        Q       A year ago?

14        A       Yeah, a year ago, year and a half ago.

15        Q       Why do you list his mortgage being June of

16   '06?

17        A       I'm sorry?

18        Q       Look at page fifteen of forty-six.  It

19   indicates Mr. McGue has a mortgage dated back to June of

20   2006.

21        A       Correct.

22        Q       Why do you have him listed as having a

23   mortgage back to June of '06 if his mortgage was obtained

24   sometime approximately '08?

25        A       It was the mortgage that was on the second --
```

1      his second mortgage was on 2650 for thirty thousand

2      dollars.

3              Q       Yes, sir.

4              A       And it moved to that property in first

5      position.

6              Q       This says he had a mortgage on 2626 as of

7      June 2006.  I'm trying to find out why you listed it that

8      way.

9              A       Prior to that -- I don't know.  I'll be very

10     honest with you.  I can't answer that question.  I

11     believe it originated in June of 2006.  I would have to

12     go back to the documents.

13             Q       Who is Jerry McGue?

14             A       A gentleman that lives in Jacksonville.  I

15     met him.  I sold a house for him, and he said to me, he

16     said, I'm only going to gamble this money away, what

17     should I do with it.  I said -- at that time, I was

18     pretty flush at the time.  I said, I will give you a

19     mortgage.  Here is what I will pay you.  I will pay you

20     two hundred a month for that.  And that's the interest he

21     has been getting on that thirty thousand.

22             Q       When did he loan you the money?

23             A       I'm going to have to go back to documents.

24             Q       Okay.  If there are documents here --

25     normally when someone comes to a deposition, there is a

1   list of documents.  I have this list here, categories.

2   We went through.  We tried to itemize and be specific.

3   There is thirty-one different lists.  I'm not going to

4   guess which documents you believe are responsive to which

5   request.  I'm going to go through this list with you.

6   Can you tell me from these documents?

7          A      If I can find it.  I don't know where it is

8   at.  There is a copy of his original note that I signed

9   somewhere in that stash.

10               MR. GOERKE:  The documents on the disk were

11          divided into segments so you are going to be able

12          to find the real estate segments.

13               THE WITNESS:  If they correspond.  I'll do my

14          best to dig it out here.  I'm onto it here, Steve,

15          but this is the problem.  This is the sale of that

16          home.  I cleared the title on it prior to.  When

17          did I buy this thing?  That would probably help

18          more than anything.  I purchased this -- what was

19          the date?  Here we go.  Okay.  This would explain.

20          The origination of that loan would have been June

21          '06.  This was purchased in January.  Escalating

22          values through the early part of '06.  I put him on

23          as a second on that property in roughly June.  I

24          don't have the exact document in front of me.  This

25          helps me because I know how that sequence went.

1    BY MR. BAKST:

2         Q       What are you looking at?

3         A       The deposit check for the purchase of that

4    property.  I purchased it roughly in February '06.

5    Jerry's home sold that year spring, and that's when I did

6    the loan with him in second position on this.

7         Q       When you are talking about property, what

8    property are you talking about?

9         A       2650.

10        Q       The one that has been sold?

11        A       The one that has been sold, yes.

12        Q       That was sold when?

13        A       I believe actually it was February of '09,

14   January 30th or February 1st, or right around that.

15        Q       Was it a short sale?

16        A       It was a short sale.

17        Q       I don't see this listed here.  I need that

18   address again.

19        A       2650 North Mulberry Road, and it would have

20   been right across the street.

21        Q       That was sold in January of '09?

22        A       It's either -- I'm looking at this closing

23   date January 28, 2009.

24        Q       I'm not finding that information here on your

25   statement of financial affairs.

1          A       If this was produced in June of this year.

2          Q       Yes, sir, but there is information where you

3   would list transfers.  I'll go through your statement of

4   financial affairs with you in a minute.  What else were

5   you looking for?

6          A       I think that the date that is dated here on

7   the closing statement is January 28, 2009 for the sale of

8   that property.

9          Q       And the thirty thousand you received was used

10  for what purpose, the money from Mr. McGue?

11         A       Just cash, liquidity.

12         Q       Do you have any contact with Mr. McGue

13  today?

14         A       Not today, but I have spoke with him in the

15  last thirty days.

16         Q       For what purpose?

17         A       To let him know he was getting noticed of the

18  bankruptcy; that I didn't have the ability to pay the

19  thirty thousand.

20         Q       What did he say to you?

21         A       Not a lot.  He has terminal cancer.  His

22  biggest concern is his health.  I have to the best of my

23  ability continued to pay that two hundred dollars a month

24  to him.  Once he passes, I don't know what will happen

25  because there is a lien on it.  We don't know whether he

1    has six months to live or a year or two.  No one knows

2    that.

3         Q    I don't have an address for him.  Your

4    schedules just say Bradley Road.

5         A    Okay.

6         Q    I presume you have an actual address for him

7    somewhere?

8         A    I'm sure I do.

9              MR. GOERKE:  I have a notice of corrections.

10             If we have it, his address, I can give you a notice

11             of correction of that address.  And I know we have

12             it on the document itself.

13             MR. BAKST:  Okay.

14             THE WITNESS:  I know where to find it.

15             MR. BAKST:  If your attorney tells me he

16             filed a notice of correction, I'll just locate

17             that.

18             THE WITNESS:  Okay.

19   BY MR. BAKST:

20        Q    Has that property been on the market to be

21   sold?

22        A    I'm sorry?

23        Q    Has that property been on the market to be

24   sold, the Wellston Road property, 2626?

25        A    No, it has not.

1     Q      Why do you value it at ten thousand dollars
2  today?
3     A      That was valued at another attorney when we
4  did the -- Paul Aragona took the other two lots at a
5  value of ten thousand dollars.
6     Q      Explain that again.  Some other person took
7  other two lots?  Are you saying there has been another
8  transfer?
9     A      There is a lot of transfers.  This one is --
10  let's go back to 2650.  There is a short sale.  The
11  proceeds all went to the lien holder.
12     Q      How much was the short sale?
13     A      I had it here.  I believe it was sixty-five
14  and the net was fifty-nine, something to that effect.
15  I'm going to see if I can find it here.  It will make it
16  easier.  If I can get a closing statement, I will.
17  Anyway, his attorney they were grasping at anything else
18  I had, and I had the other two lots vacant, the other
19  vacant two lots I had free and clear, and they took
20  them.
21     Q      Let's do one at a time.  There is two other
22  lots on Wellston Road?
23     A      Yes.  When I purchased, there were four lots.
24  Two of them -- they were divided into two each.
25     Q      What is the address of the other lots?

1    A    26 -- I don't know.  2628, something like
2  that.  It's next door to it.
3    Q    Those are two other lots?
4    A    Those are two other lots.
5    Q    Those were sold?
6    A    They were taken by Paul Aragona.
7    Q    When you say taken?
8    A    Transferred them as part of the short sale.
9    Q    You transferred these lots to -- who is Paul
10 Aragona?
11    A    Paul Aragona was the lender of 2650 North
12 Mulberry Road.
13    Q    You started referencing those properties
14 because I asked you how you arrived at the value.  What
15 value did you attribute to these lots when they were
16 transferred to Mr. Aragona?
17    A    The attorney that did that particular
18 transaction valued them at ten thousand based on tax
19 rolls at that particular time.  I think they have dropped
20 even more since.
21    Q    Just the tax assessed value?
22    A    Yes.
23    Q    Tax assessed value is you think ten thousand
24 dollars.  Is that for both lots?
25    A    Yes.

1          Q       When were these two lots transferred to

2     Mr. Aragona?

3          A       Just prior to the closing of this ordeal

4     which was January of '09.

5          Q       Who is Mr. Aragona?

6          A       That is a gentleman I have known for probably

7     seven to eight years.

8          Q       Through business or personal?

9          A       Through business.

10         Q       You have had business dealings with him?

11         A       Yes.  He was a realtor at one time.  He did

12    work in my office at one time.  His health keeps him from

13    doing anything at this particular point.

14         Q       Did he loan you money?

15         A       He did.

16         Q       How much?

17         A       One hundred thousand.

18         Q       What happened to that money?

19         A       The tail end of the story is it was on 2650

20    North Mulberry.  That's where the hundred thousand ended

21    up, and we short saled it at approximately -- here we go.

22    Sixty-four nine, there were closing costs out of it.  I

23    believe the proceeds to him were approximately fifty-nine

24    thousand give or take.  I can't find the closing

25    statement in here.

```
 1        Q      Did he ever have a mortgage, Mr. Aragona?
 2        A      Yes.
 3        Q      On 2650?
 4        A      Yes.
 5        Q      For how much?
 6        A      One hundred thousand dollars.
 7        Q      At the time of the short sale of 2650, you
 8   transferred two lots to Mr. Aragona and that was for what
 9   purpose?
10        A      Offset the debt.  I signed a note for the
11   balance which is approximately thirty-six thousand
12   dollars.
13        Q      Did you make any payments on that note?
14        A      I have not been able to.
15        Q      Does Mr. Aragona still work for your
16   office?
17        A      No, he does not.
18        Q      What does he do?
19        A      I would consider him retired at this point.
20        Q      How old is he?
21        A      Seventy something.  I don't know exactly.
22        Q      Do you know what he has done with the
23   property?
24        A      He still holds the property to my knowledge.
25   You are talking about the vacant land?
```

1      Q      Yes, sir.

2      A      He still holds the property as far as I

3   know.

4      Q      Is there any other real property that you

5   own?

6      A      I'm sorry, the question again?

7      Q      Is there any other real property that you

8   own, any other real property?

9      A      Not that I'm aware of, no.

10     Q      Will you turn to Schedule B, pages nine

11   through twelve?

12     A      Okay.

13     Q      I need you to review these four pages, take

14   as much time as you need, and confirm for me that this

15   lists all of the personal property that you owned on the

16   day you filed bankruptcy.

17     A      We have one discrepancy.

18     Q      Why don't you wait until you go through all

19   of it.

20     A      Okay.

21     Q      And tell me anything you think should be

22   changed.

23     A      Steve asked me the value of the twenty-five

24   percent interest in 885.  And I'm not sure I understand

25   the question yet because coming from real estate, what is

1    the value is not necessarily what is the liens and what

2    is against it.  The 885 to my knowledge at this point is

3    worth somewhere around six hundred to six hundred fifty

4    thousand dollars.  At that particular time, twenty-five

5    percent would be worth a hundred fifty thousand.

6           In my not knowing how to answer questions or

7    what the perceived interest is, from a realtor that's

8    what we would do, I think if you are looking for value,

9    you need to know we had a mortgage for that much plus

10   arrears on taxes so there was no value to it, but the

11   reality of the street value if you had it free and clear,

12   it would be worth this much.  That's what I assumed the

13   question was.

14        Q     Which question; talking about B13?

15        A     Yes.

16        Q     So that's something that you are stating that

17   the value that you list there of a hundred fifty thousand

18   dollars is something that you are not certain about or

19   you just explained to me how you arrived at it?

20        A     How I arrived at it.  From my terms, I'm

21   uncomfortable doing this because I don't understand the

22   terminology.  From a realtor's point of view, you ask

23   what a value of an item is, it's the retail gross value,

24   forget liens, forget what is owed, what is the gross

25   value today, what is it worth.  That's the gross value.

1        Q        The fair market value of the real estate held
2    by that corporation; correct?
3        A        The twenty-five percent of it, yes.
4        Q        Any other information that is incorrect on
5    your Schedule B?
6        A        The Legend is probably not worth four
7    thousand dollars, but that was then.  That would be
8    number twenty-five.
9                MR. GOERKE:   There was a verbal correction
10               made at the 341 regarding the second trailer.  What
11               is the Elite trailer that you told the trustee
12               about?  He's asking if the schedule is correct, and
13               you told the trustee you didn't list the trailer.
14               THE WITNESS:   That was a different trailer.
15               MR. GOERKE:   He needs to know about it.
16               THE WITNESS:   I have to explain that one too.
17               There is a 1998 two-horse trailer that was sold to
18               John Johns (phonetic) that has a balance of five
19               hundred dollars owed, still has the lien on that
20               trailer, and honestly it was out of sight, out of
21               mind.   It wasn't anything I was trying to hide.
22               There is five hundred dollars, but it's owed to the
23               party with the lien on it.
24   BY MR. BAKST:
25       Q        Who is that?

1          A       Jack Cleary.

2          Q       You sold a trailer to a John Johns?

3          A       Uh-huh.

4          Q       When?

5          A       He picked this up -- I have to get my years

6     straight.  It was in May probably.  John and I lived

7     together for about three months.  Prior to us living

8     together, I had purchased this truck so that -- he was

9     living on the west coast.  I cosigned it, put the deposit

10    down.  He was supposed to make payments on it.  That was

11    not happening.  When I ran out of money and had to stop

12    making the payments on it, it was nearing this

13    bankruptcy.  I need to go back.  When he left, he was

14    only living with me for about three months, he took the

15    trailer.  I said, okay, go ahead, if you want the

16    trailer.  I still owe five hundred dollars on it.  Oh,

17    I'll give it to you next week.  That was over a year ago.

18    I think it was May '08 when he left because it was the

19    same time when I was starting to turn things in.

20         Q       Did he pay you any money for the trailer?

21         A       No.

22         Q       How did you transfer it to him if there was a

23    lien on it?

24         A       I didn't transfer it to him.

25         Q       He just took possession of it?

```
 1          A      Yes.

 2          Q      Did he ever pay the five hundred?

 3          A      No.

 4          Q      What do you think that trailer was worth?

 5          A      If it's worth a thousand dollars, that's a

 6   lot of money.

 7          Q      That trailer went to him approximately

 8   when?

 9          A      May of '08 is when I think he left.

10          Q      Okay.  Anything else that should be listed on

11   your Schedule B that is not?

12          A      Not that I'm aware of.

13          Q      Let me ask as far as if we go to page nine of

14   forty-six which is the first page of Schedule B, you have

15   a banking account at Gulfstream Business Bank in your

16   name?

17          A      Yes, I do.

18          Q      It says you have race horse training business

19   account at Gulfstream.  Is that an account under your

20   name?

21          A      Yes, it is.

22          Q      Your household goods and furnishings you

23   value at exactly one thousand dollars.  How did you

24   arrive at that value?

25          A      It's just a number that if you sold it at a
```

```
 1   garage sale, that's probably what furniture would
 2   bring.
 3        Q     How long have you owned your furniture?
 4        A     Since early 2000.
 5        Q     Is this all of the furniture in your home?
 6        A     Yes.
 7        Q     How many square feet is that house?
 8        A     The house is twenty-four hundred.
 9        Q     Furniture it says living room, dining room,
10   one bedroom furniture, miscellaneous furnishings and
11   three TVs.  What kind of TVs are those?
12        A     One got thrown out, but two old TVs that came
13   out of the bar.  They are flat screens, and they were in
14   the bar, installed in the bar, in probably 2002, 2001.
15        Q     What bar?
16        A     Lulu's Place.
17        Q     What is that?
18        A     That's a bar that closed in '04 or '05.
19        Q     Did you own a bar?
20        A     Yes.
21        Q     What happened to the bar?  You said it
22   closed.  Did it go out of business?
23        A     It went out of business, yes.
24        Q     You had two TVs left from that?
25        A     Yes.
```

```
1          Q      Any art work in your home?
2          A      Not of any great value, no.  I mean pictures.
3          Q      Any pictures, any paintings or sculptures,
4     any art work that you paid over a thousand dollars for?
5          A      No.
6          Q      It says that you own no jewelry; is that
7     correct?
8          A      It's gone.
9          Q      What happened to it?
10         A      The majority of it was taken with Brent when
11    he left.  He took some of the diamonds I had, and then I
12    sold a couple things years ago, but I don't have anything
13    left.
14         Q      I'm sorry; Brent?
15         A      Brent was previous of Johns and when he left,
16    he took a lot of possessions at that time.
17         Q      Brent who?
18         A      Chase.
19         Q      Brent Chase took diamonds that you had?
20         A      Yes.
21         Q      When was this?
22         A      Living room furniture, furniture that I had
23    bought.
24         Q      Did he have a right to these diamonds?
25         A      I lived with him for about three years.
```

1       Q       Right.

2       A       He took more than I thought he did, but he

3   took them, and it was not worth pursuing.

4       Q       Were they your diamonds or his?

5       A       They were mine, not his.

6       Q       What was the value of these diamonds?

7       A       Diamond ring worth maybe a thousand

8   dollars.

9       Q       Anything else?

10      A       Furniture, a lot of furniture.

11      Q       What about any watches?

12      A       I don't think he took a watch.  No, I don't

13  believe so.

14      Q       How many years ago was this?

15      A       That would have been 2005 probably, 2005,

16  2006, early 2006 maybe.  I don't know.

17      Q       Any other jewelry that you have had in the

18  last few years?

19      A       No.

20      Q       Do you have a watch?

21      A       Yeah, a real good one.

22      Q       What kind of watch do you own?

23      A       I honestly don't know.  I can't see what it

24  is.

25      Q       How much did you pay for it?

```
 1        A      I think twelve dollars at Wal-Mart.
 2        Q      When is the last time you owned any other
 3   watch?
 4        A      Quite awhile.
 5        Q      How long is that?
 6        A      Three or four years, five years.
 7        Q      What kind of watch did you own?
 8        A      I had a Bouleva at one time.
 9        Q      What happened to it?
10        A      Broke.
11        Q      Then what did you do with it?
12        A      Probably still home, but it's broken.  It's
13   not working.
14        Q      How long has it been broken?
15        A      Three or four years.  That's the last time I
16   have worn it.
17        Q      Have you taken it in somewhere to get it
18   fixed?
19        A      No.  It's just laying on the dresser.
20        Q      Any other watches?
21        A      That's it.
22        Q      Life insurance policy you list here you list
23   a value of two thousand four hundred eighty-five
24   dollars?
25        A      Yes.
```

```
 1        Q      Is that the cash surrender value?

 2        A      I believe.  I'm asking you.  I need help.  I

 3   believe that's the cash.

 4        Q      Whose life is that on?

 5        A      Mine.

 6        Q      Is there any life insurance policies that you

 7   own on anybody else's life?

 8        A      No.

 9        Q      The next page is where we then list -- first

10   we have Homes of Distinction Realty.  I understand that's

11   a corporation that sells real estate?

12        A      Yes.

13        Q      Are you the sole owner?

14        A      I am.

15        Q      How long has it existed?

16        A      Since 1997.

17        Q      Is it still operating?

18        A      Barely.

19        Q      What do you mean when you say barely?

20        A      I'm in debt with that also.

21        Q      Can you be more specific?

22        A      I have a line of credit that hasn't been paid

23   on it with Washington Mutual, somewhere around twenty-six

24   thousand dollars.  I have been fighting with the copier

25   people.  They finally came and got their copier.  I have
```

1  a balance with them, and I struggle to pay the phone

2  bill.

3       Q       Does Homes of Distinction Realty own

4  anything?

5       A       It did own.

6       Q       What did it own?

7       A       It was co-owner of 12 -- State Road 64, the

8  commercial property.

9       Q       What happened to that?

10      A       That's the one that was foreclosed on.

11      Q       Does it own anything else?

12      A       An old computer.

13      Q       Any vehicles?

14      A       No.

15      Q       It's business location is on 6th Street.  Is

16  it leasing space from 885 Realty?

17      A       It is.

18      Q       Is it paying rent?

19      A       No.

20      Q       When is the last time it paid the rent?

21      A       I did pay a thousand dollars in July because

22  one deal came in.  I did put a thousand dollars in.

23      Q       Who did you pay it to?

24      A       885.

25      Q       You wrote a check to 885?

```
 1        A     Yes.

 2        Q     Who then handles the ongoing affairs of

 3    885?

 4        A     Well, I do.  But it got a check and sales tax

 5    paid on it.

 6        Q     885 is a corporation?

 7        A     It's a corporation.

 8        Q     Are you the president?

 9        A     No.

10        Q     Who is?

11        A     President I believe is Dmitrie Zemlianski.

12        Q     What is your position?

13        A     Mine is secretary.

14        Q     So Homes of Distinction is a tenant of 885?

15        A     Yes.

16        Q     Are there any other tenants that you are

17    aware of that 885 has?

18        A     Yes.

19        Q     Who are the other tenants?

20        A     Dive Shop is in A, B is not -- it's just

21    stagnant at this time, C is a doctor, long term health

22    care.

23        Q     That's in C?

24        A     That's in C.  D is Gun Works, a new

25    corporation that just opened.  E is Homes of Distinction.
```

1   F and G are Joseph's Hair Salon, just opened, and H is

2   Sherwin Williams, and they have vacated.

3        Q      Do you have anyone lined up to take it?

4        A      No.   Their lease is still in place, and they

5   are still paying until that ends.

6        Q      When is that?

7        A      I believe the spring of next -- of '12 I

8   think.

9        Q      That ends 2012?

10       A      I believe it's '12, March of '12.

11       Q      What is the monthly gross rental income of

12   885?

13       A      Right now about twelve thousand.

14       Q      How is that money being disbursed each

15   month?

16       A      First, it's not all getting collected.

17   That's the gross amount.   What comes in every month is

18   just enough to cover the mortgage.   I'm still behind on

19   the taxes.

20       Q      You say I?

21       A      Because I'm doing the books.

22       Q      Are you the one that makes the day-to-day

23   decisions on behalf of 885?

24       A      Be more specific because I don't know.

25       Q      Do you decide what bills to pay?

```
 1        A    Yes.  I mean I basically do the bookkeeping
 2   and do the billing.
 3        Q    How much money did you put into 885 when you
 4   originally obtained your ownership interest?
 5        A    Nothing.  I took a note for the twenty-five
 6   percent and was paying on that and have been until
 7   basically paid it off.  It was a seven-year note.  That
 8   would have taken us to about 2004.  And in 2005 is when I
 9   started to borrow money back from time to time.  I sent a
10   schedule in.  It shows where I would borrow money, I
11   would pay it back, and back and forth.
12        Q    Who would make the decision as to whether or
13   not to loan you money?
14        A    The partners allowed it.  We had talked about
15   it via e-mail.  It's gone too far at this point and
16   stopped.  I knew it had to stop.  They knew it had to
17   stop.  I had to stop borrowing money.  But a lot of times
18   when it came to eat, this is where the money came from.
19        Q    Homes of Distinction, how much has it grossed
20   in the last six months?
21        A    I'm going to say somewhere in the twenty
22   thousand dollar range and that might -- I'm shooting from
23   the hip on that.
24        Q    Of the twenty thousand, what are its
25   expenses?
```

1      A      Well, usually there is commissions to be paid

2    out to the other agents which is most of it.  The

3    expenses are telephones, security, electric.

4      Q      Do you keep a monthly profit and loss

5    breakdown?

6      A      Yes.

7      Q      Do you have copies here today, if you know,

8    sir?

9      A      Of the profit and loss?

10     Q      Yes, sir.

11     A      Do I?  Are they in there somewhere?

12            MR. GOERKE:  There should be a Homes of

13        Distinction section.  That's the bank statements.

14            THE WITNESS:  This would show -- this was the

15        month of May.  We had two hundred sixty-nine

16        dollars come in.  No.  A hundred dollars come in.

17        Excuse me.  I don't have what you are asking for I

18        don't believe.  I have it just through these.

19            MR. GOERKE:  There is a profit and loss.

20        Just flip through those pages.

21            THE WITNESS:  Okay.  I'll have you do this.

22            MR. GOERKE:  All right.

23            THE WITNESS:  These are the most current

24        ones.

25            MR. GOERKE:  This is reconciliations.

```
 1              THE WITNESS:  That's what I'm thinking there
 2        is.
 3              MR. GOERKE:  I know you provided profit and
 4        loss statements so they are in a pile somewhere.
 5              THE WITNESS:  I don't know where to start.
 6        These are '06.  These are old ones.
 7   BY MR. BAKST:
 8        Q     Did you find --
 9        A     I'm not finding exactly what you are looking
10   for.
11        Q     What have you found?
12        A     I found the statements for current, for
13   May.
14        Q     Can I see that?
15        A     Yes.
16        Q     Just through May.  Do you have anything more
17   recent?
18        A     I think that's this year I believe.
19        Q     How many realtors work for Homes of
20   Distinction?
21        A     At this time, I have one, two, three, three
22   agents I believe.
23        Q     What are their names?
24        A     Jeff Lempke, L-e-m-p-k-e, Jerry Owings,
25   O-w-i-n-g-s, and Jodi -- I'm going blank on that one.  I
```