1   don't remember the last name.

2        Q     Jodi with a "Y"?

3        A     Jodi with an "I", I believe.

4        Q     I presume you are the qualifying broker for

5   the office?

6        A     Yes.

7        Q     What kind of split are you giving your

8   agents?

9        A     Jodi I don't think has ever sold one.  She's

10   sixty-forty.  The other two are eighty-twenty.

11        Q     How many active listings does the business

12   have today?

13        A     Today?

14        Q     Yes.

15        A     I'm going to say less than six.  I'm not even

16   sure we have that many.

17        Q     How much money have you received from this

18   corporation since the bankruptcy filing that was June 10,

19   '09 either as compensation, salary, reimbursements of

20   expenses or payment of any expenses?

21        A     Since June?

22        Q     June 10 of '09.

23        A     I took two fifty last week and three hundred

24   the week before, and when I had one closing, I think I

25   took a thousand dollars out, but it had to go to an

1    account to be paid.  Two hundred of it went to Jerry, and
2    I think I got eight hundred dollars.
3         Q    Jerry who?
4         A    Jerry McGue.  I'm still paying him.
5         Q    That's all of the money that's been paid out
6    either to you or on your behalf since the bankruptcy
7    filing from this corporation?
8         A    To me.  There is money that's been to the
9    race horse funds that had a debt that had to get settled,
10   and that was approximately five thousand dollars.  And
11   that was a veterinarian bill.
12        Q    Why did Homes of Distinction have a
13   veterinarian bill?
14        A    It didn't.  It went from that account to the
15   TRE account.  You asked me about that in the beginning.
16        Q    That's an account under your name?
17        A    It's under my name, but it was debt that was
18   current and had to be done.
19        Q    It was a debt of yours?
20        A    Here is the problem.  It wasn't mine.  It was
21   horses I had taken care of that I hadn't covered the
22   bills on through the last year, and I needed to pay
23   that.
24        Q    It sounds like you owed five thousand
25   dollars?

```
 1          A       Well, I owed it for other people because it's
 2    not mine to use.  It was and it had to get paid.
 3          Q       What is not yours to use?
 4          A       These are horses that I take care of that I
 5    built up for their vet bill, and the vet hadn't received
 6    his payment and needed to be.
 7          Q       You had an agreement with the vet to pay?
 8          A       There was no agreement.  I owed the money.
 9    It's my responsibility.
10          Q       Homes of Distinction paid that five thousand
11    dollars to you, and you then paid it to the vet?
12          A       Yes, out of that account.  That is directly
13    horse in related, horse out.  That was the last debt that
14    had.  And it stemmed from quite awhile back.  Again, I
15    didn't have money to pay bills.
16          Q       When was that paid?
17          A       That was paid probably in July.
18          Q       Who is Michael Scott?
19          A       Michael Scott was an agent.  You know what,
20    put him on there too.  I forgot Michael has done one deal
21    this year.  Michael has a full time job, doesn't come in
22    the office.  He has a license that hangs there.
23          Q       Is Homes of Distinction a party to any
24    litigation?
25          A       No.
```

1      Q     Its debts are landlord for rent?

2      A     Uh-huh.

3      Q     And a line of credit with Washington Mutual

4 of twenty-six thousand dollars?

5      A     Correct.

6      Q     Are you also obligated on that line of credit

7 personally?

8      A     I believe I was.  I named it, but I think --

9 I'm not positive that I was, but it was named.

10     Q     Did it have any other debts?

11     A     Yes.  It was part of the bankruptcy.  Not the

12 bankruptcy.  Listen to me.  The foreclosure of the 1210

13 State Road 64.

14     Q     A deficiency claim is what you are referring

15 to?

16     A     I don't understand what the term is.

17     Q     Based on that foreclosure if there is any

18 money still owed, it owes that?

19     A     Yes.  I think once they sell it, they will

20 come back with a deficiency is what I'm assuming.

21     Q     Any other debts?

22     A     The copier people are still on me for three

23 hundred fifty dollars.  And I believe that's it.  I don't

24 think there is anything else.

25     Q     Have you considered filing bankruptcy for

1   Homes of Distinction?

2       A    I have asked.  I don't have the finances to

3   do it right now.  I don't know what we are going to do

4   with Homes of Distinction.  We may just close it.

5       Q    How are you earning money the last few

6   months; just through that business?

7       A    That and with the horses, I make about a

8   hundred dollars a week.

9       Q    What documents do you have for Homes of

10  Distinction?  Let me go through whatever does exist for

11  that.

12      A    This is the old documents.  The corporate is

13  here.  I'm going to need to ask for a break.

14           MR. BAKST:  Okay.

15           (Whereupon, a short recess was taken.)

16           MR. GOERKE:  This is the Homes of Distinction

17      file, and this is more Homes of Distinction.  This

18      entire file is Homes of Distinction.

19  BY MR. BAKST:

20      Q    I do have certain bank records you gave the

21  trustee, and I have an '08 tax return.

22           MR. GOERKE:  Here are more tax returns.

23           MR. BAKST:  Is that the same?

24           MR. GOERKE:  This should have all of the tax

25      returns.  Whatever the time period you asked for, I

1     responded to.

2          MR. BAKST:  This is '08 which I have so I'm

3     going to give that back to you, and you handed me

4     '05.

5          MR. GOERKE:  This file here has other tax

6     returns.  I think it has the '06 and '07 in here.

7          THE WITNESS:  This is '07 and '06.

8  BY MR. BAKST:

9     Q    Is there a profit and loss that you have for

10 this business?

11         MR. GOERKE:  I haven't seen that.  I remember

12    seeing profit and loss statements.  I just don't

13    remember.  It's possible some stuff went to the

14    trustee and not to here.

15         MR. BAKST:  I'm going through now whatever

16    the trustee got to me which I think is whatever was

17    produced to her.  Let me see.  Let me verify if I

18    can find any type of profit and loss.

19         MR. GOERKE:  In my mind, I remember seeing

20    profit and loss.  I don't know if it's the

21    reconciliation statements that I'm thinking of.

22         THE WITNESS:  Is it not part of the tax

23    return?

24         MR. GOERKE:  There may be a profit and loss.

25    He's looking for monthly I believe.

```
 1              MR. BAKST:  Right.

 2              MR. GOERKE:  He has on his statements an

 3         actual monthly reconciliation.  That's on each

 4         monthly statement.

 5    BY MR. BAKST:

 6         Q    You don't maintain a profit and loss

 7    statement for the business?

 8         A    No, I don't.

 9         Q    Do you have an accountant for the business?

10         A    Yes.

11         Q    They don't keep track of that for you?

12         A    No.  All I do is the disk goes in quarterly

13    and that's what generates the tax return.

14         Q    Who is your accountant?

15         A    The accountant is Tom Abbet (phonetic).

16              MR. GOERKE:  The question was what do we have

17         on Homes of Distinction.  We have the tax returns

18         and the statements.

19    BY MR. BAKST:

20         Q    Do you have statements other than -- you

21    showed me some recent ones.  Are those other statements

22    in front of you?

23         A    Yes.  These go back to '06.

24         Q    What do you have for '08?

25         A    '08 would be another stack.  This is '08
```

1    right here, and this is all '08 statements.

2         Q     Homes of Distinction?

3         A     Uh-huh.

4         Q     Is there more than one account?   The

5    Heartland account, is that the same one?

6         A     That Heartland account was for operation of

7    1260 State Road 64.   There was very little activity, but

8    whatever did go through, it was open for about a year.

9         Q     How do you decide which money to put into the

10   TRE horse account?

11        A     How do I decide?

12        Q     Right.   I'm looking at statements now, for

13   example, December of '08, and there is a balance for

14   deposits of just over nineteen thousand dollars.

15        A     In the horse racing industry, in that

16   particular sector, training bills, training is a per diem

17   per horse, is put in on a monthly basis.   The cost then

18   is deducted out, the feed, the cost to care, incidentals,

19   equipment, whatever we have to buy for that particular

20   horse, is deducted from that amount or out of that

21   account, and also their winnings.   At that particular

22   time, I owned a few horses still racing, and there would

23   also be purse money going into there.

24        Q     There is also what; I'm sorry?

25        A     Purse money, income from the horse.

```
 1          Q     When is the last time you owned a horse?
 2          A     The last time I owned a horse was I think
 3   February.
 4          Q     Of '09?
 5          A     Of '09.
 6          Q     What happened to the horse?
 7          A     It was sold.
 8          Q     For how much?
 9          A     About four thousand dollars.
10          Q     To whom?
11          A     A young girl.  I cannot think of her name.
12   Her boyfriend/husband was Gary Lameister (phonetic).
13          Q     Were you paid in cash or check?
14          A     Check.
15          Q     What happened to the check?
16          A     It was deposited into the account to cover
17   the bills.
18          Q     Which account?
19          A     The TRE horse account.
20          Q     Have you owned any horses before then?
21          A     Oh, yes.
22          Q     When is the last time you sold or transferred
23   any other horses?
24          A     All during that period of time.  What had
25   happened, what ended it, was a year ago in November, they
```

1    announced they weren't going to race the summer which

2    made everything go awry.  Everything had to go.  I think

3    the majority of the horses were sold probably before I

4    came back here.  I'm sorry.  Again, this is like a blur

5    to me.  I'm thinking most were sold about November of

6    last year, of '08.

7         Q    How many horses were sold at that time?

8         A    There might have been three or four.

9         Q    For how much money?

10        A    Not much in any of them.  They were not much

11   value.  The one was maybe two thousand dollars.  I know

12   one sold really cheap for five hundred.  I think one was

13   a thousand dollars.  I -- it's in the records.

14        Q    Who was the purchaser?

15        A    Different people.

16        Q    Anyone that was ever friends or family

17   members?

18        A    No.

19        Q    When you say they are in the records, what

20   records are you referring to?

21        A    In the checkbook.  In the checking book, you

22   will see a deposit.  If it was sold, it got put into the

23   checking account, into the TRE account, and deposits

24   aren't real clear.

25        Q    We have certain deposits into this account.

1    I'm looking in January.  There is four thousand eight

2    hundred twenty-seven dollars fifty cents.  That's a

3    deposit.

4         A    That would be a training bill, training for

5    the horses, conglomerate.  It's not a high profit.  You

6    will see a lot of money in and out.  That's 885.  I don't

7    know what that is doing in there.

8         Q    I'm going through the records the trustee has

9    received.  Have you spoken to the other owners of 885

10   about selling that property?

11        A    In November of last year, of '08, we were

12   starting to get behind, and I asked them if they wanted

13   just to give up on it and let it go into foreclosure, and

14   they did not want to do that.  They did not want to sell

15   it.  They wanted to maintain it and ride it out and see

16   if it comes back.

17        Q    What is the mortgage on the property?

18        A    Approximately six hundred thirty thousand

19   dollars I think, but don't hold me to that exact amount.

20   Roughly six hundred thousand.

21        Q    You believe the property itself is worth

22   about six hundred thousand?

23        A    That's about all it's worth today.

24        Q    What was the purchase price?

25        A    Eight twenty-five.

1    Q    When was that?

2    A    1997.

3    Q    You think that the current value is less than

4    that?

5    A    Yes, I do.  And the reason I'm doing it is

6    based on income and taxes.  The cost factor to operate

7    it, the taxes is about twenty-two percent of the gross

8    income right now.

9    Q    You have done it from a cost basis?

10   A    Yes.

11   Q    Have you spoken to any commercial realtors

12   about listing the property?

13   A    No.  I am a commercial realtor.  I do

14   commercial.  And I can tell you that this would be a hard

15   sell based on lack of income because if you actually --

16   the form that you just pulled up is the pro forma, but no

17   one is living up to the debt.

18   Q    Have you brought eviction actions to any

19   tenants that are not paying rent?

20   A    I haven't.  I have in the past.  The tenants

21   I have now have been there for quite a few years.  I

22   never had to chase them for a dime until the last two

23   years, and it's become more difficult.  They pay

24   something.  If they are working with me, I stick with

25   them.  It's easier than trying to replace them.  I have

1   empty space that I could put them in if I had more

2   tenants -- in other words, if I had an abundance of

3   people wanting to lease, I could make accommodations.   I

4   have got vacancies and so do the two malls, the ones on

5   either side of me.

6        Q    Is the mortgage current on the 885

7   property?

8        A    It is as of today, yes.

9        Q    I don't know if that's listed here.   Who

10  holds the mortgage?

11       A    Gulfstream Business Bank.

12       Q    Gulfstream as far as you are concerned is

13  owed about six hundred thirty thousand; right?

14       A    I can get the exact amount.

15       Q    You think it's approximately that amount?

16       A    Approximately that much.

17       Q    You list on your Schedule B20 beneficial

18  interest in a 2006 Restatement Terry R. Eichas Trust

19  Agreement.   It says sole asset is a half interest Oak Run

20  property.   Is that the property that you refer to as the

21  12742 property?

22       A    Okay.   That should be a whole interest to

23  that.

24       Q    Okay.   Not a half interest?

25       A    You are confusing me.   I'm sorry.

1        Q      I'm looking at your Schedule B20.  It's on
2    page ten of forty-six.
3        A      Okay.  Beneficial interest in 2006
4    Restatement, half interest in Oak Run property.  That is
5    an error.  That is the whole interest if that is the --
6            MR. GOERKE:  For information, I believe that
7        the schedule is correct because I matched it
8        against the deeds, and I'm sure we have the deed
9        here.  I think that's my entry.
10            THE WITNESS:  You have the deed?
11            MR. GOERKE:  I thought there was a quitclaim
12        deed.
13            THE WITNESS:  The problem is we were
14        quitclaiming in and out of my name from the trust
15        to me personally and then back to the trust because
16        when we did financing on it, you have to sign
17        personally.  They don't loan to a trust, if I'm not
18        mistaken.
19            MR. GOERKE:  Pull your file, and see if there
20        is a quitclaim deed.
21            THE WITNESS:  This is the -- this is from
22        Citibank, but it's either or.
23            MR. GOERKE:  Let me show you this Citibank
24        foreclosure reflects it's Terry R. Eichas
25        individually and as trustee of the Terry R. Eichas

1          Trust dated September 3rd, 1998.

2                  MR. BAKST:   What were you looking at; the

3          deed?

4                  MR. GOERKE:   The foreclosure complaint.   It's

5          alleging who the ownership is.

6                  MR. BAKST:   Okay.

7                  MR. GOERKE:   It is showing like an and/or

8          kind of thing.

9   BY MR. BAKST:

10         Q       We have already discussed that property, but

11  I see here this -- I think I got a copy of this trust

12  that the trustee gave me, Miss Menotte gave me.   Can you

13  identify that please?

14         A       I believe that was the last one.

15         Q       It looks like that owns more than just an

16  interest in that property?

17         A       Wait a minute.   Oh, yes.   There is one after

18  this.   There is a 2007 Restatement.

19         Q       There is an amendment to the trust; is that

20  what you are referring to?

21         A       I believe that's what you would call it.   I

22  know that because that one still mentions Brent and there

23  was one done after that, and a lot of those corporations

24  have gone away at that time.

25         Q       Do you know why you refer to it on your

1   schedules as the 2006 Restatement?

2           MR. GOERKE:  You need the trust you said?

3           THE WITNESS:  Yes, for 2007.

4           MR. BAKST:  This is a deed.  I'll give this

5   back to you.  That's the Oak Run property.  You can

6   have that back.  I'm looking at the '06

7   Restatement.

8           MR. GOERKE:  Whatever you sent me

9   originally --

10          THE WITNESS:  I may not have given you the

11  most current one.  There should be a 2007 which

12  would have eliminated -- there should be a 2007.

13          MR. GOERKE:  I just found some profit and

14  loss statements for Homes of Distinction.  I may

15  have more here.

16          THE WITNESS:  I apologize.  They were done.

17  Okay.  I think these were prepared at the request

18  of this year, Homes of Distinction.

19          MR. GOERKE:  I don't know if these are the

20  same or different.

21          THE WITNESS:  June 1, '09.  These were

22  prepared for this.

23          MR. GOERKE:  What was the trust we are

24  looking for?

25          THE WITNESS:  2007.

1          MR. GOERKE:  We have one here.  It's in the

2     documents.

3          THE WITNESS:  This is my will.

4          MR. GOERKE:  Isn't the trust attached to

5     it?

6          THE WITNESS:  Possibly.  I'm going to let an

7     attorney look at this.  I have no idea.

8  BY MR. BAKST:

9     Q    This is a will?

10    A    It's the will.

11         MR. GOERKE:  Let me see.

12         THE WITNESS:  I'm going nuts with this.

13         MR. GOERKE:  Here it is.  It's attached.

14         THE WITNESS:  Is that the 2007?

15         MR. GOERKE:  I believe so.

16 BY MR. BAKST:

17    Q    Is this supposed to be some amendment of this

18 trust?

19    A    Yes.

20    Q    So this has an attachment referencing

21 transfers.  The '06 lists -- there is a page here that

22 refers to various entities, membership interest in GJTT,

23 LLC.  What is that?

24    A    That was a group that I sold property to and

25 then bought into.

```
 1        Q      What happened to that?

 2        A      I had to sell my interest.

 3        Q      When did you sell it?

 4        A      I believe that went in May of '08.

 5        Q      How much did you sell it for?

 6        A      Ten thousand dollars.

 7        Q      Who did you sell it to?

 8        A      A third party.  I don't know the gentleman.

 9   The particular party that put this together.

10              MR. GOERKE:  Which one was that?

11              MR. BAKST:  GJTT.

12              THE WITNESS:  The payment on that was like, I

13         don't know, eleven hundred dollars a month or

14         something like that, and I had no money at all.

15         Here it is here.  This is the financial on it.

16         This is the original purchase.  And here is the --

17         Jian Zhen I think is the purchaser.  June 2nd of

18         '08 this was completed on.

19   BY MR. BAKST:

20        Q      June 2nd of '08.  Do you have documents?

21        A      This is the whole thing right here from start

22   to finish, and this is a -- the K-1.

23        Q      This shows that you owned a one-third

24   interest.

25        A      Whatever amount it was, yeah, thirty-three
```

1   percent.

2        Q      This does not appear to be owned by a trust.

3   This appears to be owned by you.

4        A      Okay.

5        Q      It appears you sold your interest to -- this

6   is when you bought your interest?

7        A      That's when I bought the interest, yes.

8        Q      You bought it for two hundred twenty thousand

9   dollars?

10       A      There were two parcels, two hundred twenty

11  thousand each.  There is another statement in there

12  also.

13       Q      You bought it for four hundred forty

14  thousand?

15       A      Yes.  I didn't buy it.  The group bought it,

16  and I bought part of it.

17       Q      You owned a one-third interest?

18       A      Yes.

19       Q      The total price was four hundred forty

20  thousand of which you owned one-third.  Figure one-third

21  of that, of four hundred forty, it's certainly over a

22  hundred twenty thousand dollars?

23       A      Correct.

24       Q      Is that how much you put into it?

25       A      No.  I put in -- there are statements in

1    there.  I think it was about somewhere between sixty

2    thousand dollars that I had put in over the period of

3    time.  It was a thirty percent down, and then I paid the

4    mortgage from '06 until I had to get out or made my share

5    anyway, my payments.

6        Q    Then you have a will here.  Why is that part

7    of this documentation?

8        A    My will?

9        Q    No.  It doesn't look like your will.

10   MacDonald?

11       A    That's the MacDonald Trust.  Jeff MacDonald

12   put money -- that is part of the family that were the

13   buyers.

14           MR. BAKST:  I'll make this a composite.  This

15       will be Exhibit 2, documents relating to GJTT.

16           (Whereupon, Trustee's Exhibit Number 2 was

17       marked for identification.)

18           MR. BAKST:  I marked Exhibit 3 the '08 K-1.

19           (Whereupon, Trustee's Exhibit Number 3 was

20       marked for identification.)

21   BY MR. BAKST:

22       Q    How did you arrive at a price of ten thousand

23   dollars to sell your interest?

24       A    That was an offer.  I was behind on the

25   payments, and I couldn't carry the payment.

```
 1        Q      That's the sole reason?
 2        A      That's the sole reason.
 3        Q      You sold --
 4        A      They had an offer of ten thousand dollars,
 5   and I said just, sell it, I can't make the payments.
 6        Q      What do you think the value was of your
 7   one-third interest?
 8        A      I honestly don't know what it was.  I don't
 9   know what it's worth today.
10        Q      It owns property?
11        A      Vacant land on State Road 64.
12        Q      Is there a mortgage on the land?
13        A      Yes, there is.
14        Q      What is the mortgage?
15        A      It would state on the closing statement.
16   It's easier getting it off there than me trying to
17   guess.
18        Q      There you go.
19        A      Principal of new loan is a hundred fifty-four
20   thousand on this one.  And a second parcel is again a
21   hundred fifty-four thousand.
22        Q      There is about three hundred thousand dollars
23   in mortgages?
24        A      Yes.  And the last time I know they were
25   trying to sell it, they couldn't get enough to break off
```

1    five acres.  They couldn't get enough of the five acres

2    to break it off and get released from the bank.  They

3    couldn't get enough out of it to do that.  And that was

4    after I had sold out a year ago.

5         Q    Let me see that again.  The mortgage is three

6    hundred.  You paid four forty.  You are saying they

7    couldn't get enough out of the bank for what?

8         A    They were trying to do five acres.  This is

9    twenty some acres of total purchase.  And they had a

10   party interested in five acres of it.  And they couldn't

11   get enough for the five acres for the bank to release it

12   because the values had dropped so badly in that area.

13        Q    Who is this person that bought it?

14        A    Who is what person?

15        Q    Jian Zhen?

16        A    I have no idea who it is.

17        Q    J-i-a-n next word Z-h-e-n.  You have no idea

18   who that person is?

19        A    I have no idea.

20        Q    Who found that person?

21        A    It was found by Dick.  They live in Indiana.

22   I believe he's an Indiana resident.  I'm not sure.  They

23   are an accounting firm.  And the gentleman showed

24   interest to purchase.  That was the offer.

25        Q    Can you show me in the bank records where

1   that money was deposited, the ten thousand?

2       A    I think so.

3       Q    It would be in your personal bank records;

4   correct?

5       A    Either my personal or 885 if I did it there,

6   but I'm not sure, but we will find it someplace.  The

7   date on it was May or June?  Okay.  '08.  I need bank

8   statements for those two properties for myself.  It

9   depends whoever needed money at that time.  It was at

10  that time, I was getting desperate.  It's got to be '08.

11  Ten thousand dollars, 6/6, ten thousand dollars deposited

12  into my personal account.

13      Q    How was this spent, if you know?

14      A    Pray tell it went out quick.

15      Q    I see transfers seventy-five hundred and

16  twenty-five hundred appear to have gone out?

17      A    Okay.  I can tell from the account numbers

18  where they went.

19      Q    I'm sorry.  It looks like that -- yes, it

20  looks like that went out.

21      A    I can tell you from the account numbers.

22  3990 should be 885, and if we can find an 885 statement

23  somewhere, I can verify that.

24      Q    Horse account is 8383?

25      A    8383?

```
1          Q      Right.  Is that the account?
2          A      No.  It didn't go there.  It probably went to
3     Homes of Distinction probably.
4          Q      That ends in 0475.  Do you know what the 885
5     account is?
6          A      It should be the 3990.  The larger amounts
7     I'm sure went to 885.  I want to verify so I can hand it
8     to you.
9                 MR. GOERKE:  What are we looking for?
10                THE WITNESS:  I want to verify to him that's
11           where it went.  That's your bottom statement.
12    BY MR. BAKST:
13         Q      We are looking at --
14         A      Seventy-five hundred going to them.
15         Q      Why did you transfer seventy-five hundred to
16    885 at that time?
17         A      I owed them a hundred fifty thousand, and I
18    had to give them some money for operating.  What was
19    happening during a lot of this time 885 has never been
20    flush.  We were behind on taxes and everything else.  So
21    if I got money, I put it towards my debt.
22         Q      On June 9, '08, you transferred seventy-five
23    hundred to 885 and that was for past due debt?
24         A      Yes.
25         Q      Any other money going to 885 at or around
```

1   that time?

2          A     I don't think I had any more money.

3                MR. GOERKE:   You should have a statement.

4   BY MR. BAKST:

5          Q     Have you transferred any other money to 885

6   since --

7          A     Since then?

8          Q     Yes, since then.

9          A     I don't believe so, Michael.  I would have to

10  have the chart of accounts in front of me, but I don't

11  believe I have.

12         Q     We will put these back with the rest of these

13  documents.  I also have seen you had an interest in

14  something called Cazar Realty, C-a-z-a-r?

15         A     Yes.

16         Q     What has happened to that?

17         A     That absolutely did nothing and went away.

18  It never had a checking account.  It never had any

19  activity.  It was designed to do business with Brent, and

20  it ended before it ever got started, and it ended that

21  year.  I don't believe we filed it.

22         Q     You list something called BHTT, Inc.

23         A     Okay.

24         Q     Is that one -- we have so many acronyms

25  today.

```
 1        A     That's the one with the builder that we were
 2  unable to build, got as far as the plans.  It did
 3  nothing.
 4        Q     The '07 restatement of this trust also lists
 5  as part of some Schedule A attached shares in Delray
 6  Beach Realty Group, Inc.?
 7        A     Correct.
 8        Q     What happened to that?
 9        A     I had sold it, and that was the last bit of
10  cash that I had that came in, in January I believe of
11  '07.
12        Q     That was sold in January of '07?
13        A     It was sold in '06 I believe.  I just don't
14  want to do this wrong.  Please give me a second.
15        Q     I'll give you your documents.
16        A     I'm not going to -- what is this?
17              MR. GOERKE:  Your Delray Beach contract and
18        document.
19              THE WITNESS:  The final payment came in
20        January, and I just don't want to tell him the
21        wrong year.  The 7th of March 2006.  That would be
22        correct, and then 2007 is when I got the final
23        payment?
24              MR. GOERKE:  I don't know.  That's the
25        contract right there.
```

1           THE WITNESS:  He can read this please for me.

2      I'm just trying to make something happen.

3  BY MR. BAKST:

4      Q     What do you want to show me?

5      A     What happened is -- and it's in the tax

6  rolls.  We sold it, and then the following year I got the

7  last payment in January, and it was five hundred

8  thousand.

9      Q     Five hundred what?

10     A     Thousand.

11     Q     You received five hundred thousand dollars?

12     A     Yes.

13     Q     When was that?

14     A     I think '07, but I'm not sure.  Whatever that

15  date is.

16     Q     Well, you are handing me from '07 a K-1

17  reflecting your interest and showing net rental real

18  estate income, loss of seven thousand one seventy.  But

19  you are saying you received a half million dollars?

20     A     For the sale of it.

21     Q     The five hundred thousand was received

22  when?

23           MR. GOERKE:  Is it in the contract?

24           THE WITNESS:  I think so, but I can't find

25      the dates.  The darn thing isn't dated.

```
 1                MR. GOERKE:  Where did the money go?
 2                THE WITNESS:  Paying bills.
 3                MR. GOERKE:  What account would you have put
 4          it in?
 5                THE WITNESS:  Personal, but -- well, let's
 6          see if it was January.
 7    BY MR. BAKST:
 8          Q     You think it was sold sometime around January
 9    of '07?
10          A     No.  That's not what I said.
11          Q     Okay.  When do you think it was sold?  You
12    can have this back.
13          A     That's the contract right there.
14          Q     This is January '06.  You were the seller to
15    Richard McGloin and David Goodmanson?
16          A     Okay.  That's when it sold.  It actually
17    closed in March, and then my final payment would have
18    been January of '07.  I'm sorry.  I'm very confused on
19    dates and things.  And I got the final five hundred
20    thousand.
21          Q     You said the final five hundred thousand?
22          A     Uh-huh.  There was five hundred thousand
23    there.
24          Q     You sold it for one point two million?
25          A     I got two hundred in assets up front, and
```

1   then five hundred thousand in cash in March which is why

2   I bought all of those other items is what the money --

3   some of the other items that you had -- I don't want to

4   get into that.  There is a lot more property that was

5   bought and sold.  And then the final payment came in '07,

6   and that's what I lived on for the next year and a half

7   without having much income.

8        Q     That would be reflected in your bank

9   records?

10        A     Yes.

11        Q     There is a deposit of five hundred thousand

12   dollars?

13        A     Yes.  It will take me a second.

14             MR. BAKST:  I'll make this Exhibit 4 will be

15        the documents on this contract for sale and

16        purchase.

17             (Whereupon, Trustee's Exhibit Number 4 was

18        marked for identification.)

19             MR. GOERKE:  Do you need the K-1 also,

20        Michael?

21             MR. BAKST:  Please.

22             (Whereupon, Trustee's Exhibit Number 5 was

23        marked for identification.)

24             MR. BAKST:  Five will be the K-1 as to Delray

25        Beach Realty.

```
 1                THE WITNESS:  Okay.
 2   BY MR. BAKST:
 3        Q     You have handed me a statement, page one of
 4   an account at Gulfstream Business Bank ending in 3299
 5   from January 31, '07.  There is a deposit from James M.
 6   Reyer, P.A., five hundred thousand dollars, also another
 7   hundred twenty-five thousand dollars from L and R Title.
 8   What was that for?  I'll hand it back.
 9        A     I'm thinking that this was the vacant land.
10   Why though L and R did the title on it?
11                MR. GOERKE:  What was the time of that?
12                MR. BAKST:  January of '07.
13                THE WITNESS:  This is January 4 of '07.  What
14           I'm thinking is I sold a piece of vacant land --
15           oh, I know exactly what this is.  Okay.  This is
16           '07 though.  I don't know what this is.  L and R
17           Title.  Let me look at my records.  The amount was
18           one twenty-five.  Okay.
19   BY MR. BAKST:
20        Q     Were you able to ascertain where that came
21   from?
22        A     I think that was the second -- that was a
23   refi on Skyline.
24        Q     Refi of what?
25        A     Pardon?
```

```
 1          Q      Refi on what?
 2          A      Skyline Drive.
 3          Q      Is that statement within all of these other
 4   documents?
 5          A      What statement?
 6          Q      The one that reflected the five hundred
 7   thousand dollar deposit.  I want to make sure we keep
 8   those all together.
 9          A      Yes.  It's right here.
10          Q      What is Carousel Grill, Inc.?
11          A      That is a restaurant dissolved in 2000 maybe.
12   No.  Before then.  1998 maybe.
13          Q      Lulu's Place is a business that you owned
14   that you say is closed?
15          A      Closed 2005.
16          Q      The Bal Harbor apartment condo, is that one
17   we discussed so far?
18          A      No.  That was sold in 2003 when I purchased
19   Oak Run.
20          Q      Royalty Title?
21          A      Went out of business.
22          Q      Approximately when?
23          A      June of '08.
24          Q      What happened to any of its remaining either
25   accounts, inventory?
```

```
 1        A     Nothing left.

 2        Q     Furniture, fixtures?

 3        A     A lovely old copier, and that's about it.

 4        Q     Does it have any receivables?

 5        A     No.

 6        Q     Beach Street Burgers, Inc., what happened to

 7   that?

 8        A     Dissolved.

 9        Q     How long ago?

10        A     I'm thinking way before -- '04 maybe, '03.

11        Q     There is also real property here.  I'll try

12   and match it up with what you have got.  Oak Run Court

13   which is the same one on Schedule A.  Sunset Pines Drive,

14   what happened to that property?

15        A     Bought and sold.

16        Q     When was it sold?

17        A     There is a file that came over from the title

18   company, and I asked them because I couldn't possibly

19   remember all of those houses.  There were three of them

20   in there.

21        Q     There is Sunset Pines Drive, there is Pine

22   Grove Drive.

23        A     There should be two Pine Groves.

24        Q     Right.  Were these properties deeded to the

25   trust?
```

```
 1        A      No.  To me.

 2        Q      So you owned them?

 3        A      I don't believe they were deeded to the

 4   trust.  I believe I owned them.  You are going back

 5   years.  I don't remember.  There is no one else involved.

 6   It's only been me.

 7        Q      Well, have they been sold within, say, since

 8   the year '07?

 9        A      Yes.  They were sold probably back in '05 or

10   '06.

11        Q      All three of these properties?

12        A      Yes, all of them.

13               MR. GOERKE:  We have the documents.

14   BY MR. BAKST:

15        Q      They go back to those dates?

16        A      I had the title company send this package

17   over, and it showed all of the documents from them on

18   those properties that I owned.

19        Q      Are there any other trusts which you are a

20   beneficiary or trustee?

21        A      No.

22        Q      If we get back to now the schedules, we were

23   on the Schedule B, looking at page eleven of forty-six

24   where you list the '05 Ford pick up co-owned with John

25   Johns.
```

```
 1        A     Yes.

 2        Q     Where is that vehicle today?

 3        A     Hopefully being picked up fifteen minutes

 4   ago.

 5        Q     By whom?

 6        A     By a collection company for Gulfstream

 7   Business Bank.

 8        Q     There is a lien on the car?

 9        A     Yes.

10        Q     Then you list Legend trailer?

11        A     Yes.

12        Q     That's an '01.  There is more than one

13   trailer; right?

14        A     A 1998 and 2000.

15        Q     Where is the 2000 Legend trailer?

16        A     I have that one.

17        Q     You think you owe Mr. Cleary twenty-nine

18   thousand dollars against that?

19        A     No.

20        Q     Your Schedule D indicates --

21        A     I owe him twenty-nine thousand dollars.

22   That's the collateral he's holding, yes.

23        Q     Does he have the title to the trailer?

24        A     Yes.

25        Q     Is he listed on the title as holding a
```

1   lien?

2        A     Yes.

3        Q     Who prepared those loan documents?

4        A     The loan documents?

5        Q     Right.  Did you sign a security agreement

6   with Mr. Cleary giving him a lien on the trailer?

7        A     I signed something at the Motor Vehicle

8   Department.  I filled out the form there on the vehicles.

9   That's what I did for him.

10       Q     Did you sign anything agreeing that he has a

11   lien on that, anything in writing promising to pay him

12   and giving him a lien?

13       A     I promised to give him a lien is all I did.

14       Q     Did you sign a security agreement, some

15   contract, that says he has a lien on that trailer?

16       A     I'm sorry, I don't understand what you are

17   asking me.  At the Motor Vehicle Department, I signed a

18   lien on it, on that trailer.  I'm sorry.  I don't know

19   what you are asking me.

20       Q     We have contacted Mr. Cleary for information.

21   Let me see if I can find the letter we sent to him.

22   There was also a Ford pick up truck apparently you

23   believe was transferred to him?

24       A     Had a lien on it and the trailer.

25       Q     Why was that transferred to him?

1      A      Well, I had borrowed fifty thousand from him,

2   and these were the collateral items that I had given him.

3   This is going to dirty the water because you are going to

4   ask for papers but I can't.  Remember, we talked about a

5   horse that I put in his name also.

6      Q      We received a message August 19 from

7   Mr. Cleary.  He left a voice mail saying it was never in

8   his possession, talking about the '04 Ford pick up, and

9   he believes it's been returned to a dealership.

10     A      He sent me to a dealership with it.  I took

11  it out to CarMax to get a value, and I did that, and he

12  directed me to a dealer.  He did something with it.  I

13  don't know.  But I didn't get any proceeds from it.

14     Q      Did you sign over a title at the

15  dealership?

16     A      I didn't have a title.  He had it.

17     Q      You took it to a dealership and, what, left

18  it there?

19     A      Yes.

20     Q      When was that?

21     A      That was in May.

22     Q      Of this year?

23     A      Yes.

24     Q      He says he never had possession of it.  Is

25  that true?

1       A       Probably.  I was telling him everything had
2    to go and blah, blah, blah, and that's what happened.
3    And he said, get a value on it first.  And then I took it
4    to a Ford dealer.  The only thing I kept was the one
5    trailer.
6            Q       You have that trailer still?
7            A       I do, yes.
8            Q       Why do you think the trailer is worth four
9    thousand dollars?
10           A       It's a stretch on it at that.  It's probably
11   worth closer to twenty-five hundred.
12           Q       Who drafted the security agreement and loan
13   documents between yourself -- or, actually, between I
14   guess yourself and 885 Realty Group?
15           A       Jim Reyer.
16           Q       Whose attorney is he?
17           A       Who is he?  I don't know that he -- he is the
18   one that has taken care of 885 since its origination and
19   done all of the legal work on it.
20           Q       Was he their attorney?
21           A       I guess so.  He's done all of the work for
22   it.
23           Q       Where are your physical stock certificates
24   for 885?
25           A       He has them.

1          Q      How long has he had them?

2          A      Since that last instrument was drawn.

3          Q      I can't tell from your Schedule B on page

4     fourteen of forty-six where it lists a pledge of shares

5     to 885 Realty.  It says '05 through '08.  Weren't these

6     documents actually executed in '08?

7          A      Yes.  It's money I had owed them.

8          Q      What happened at or around that time that

9     caused you to then sign these documents?

10         A      I told Jim what my financial situation was,

11    and he recommended that I do this.

12         Q      Jim is the attorney for 885?

13         A      Yes.

14         Q      Is he your attorney as well?

15         A      He does work for me too, yes.

16         Q      I'm sorry, you signed all of these documents

17    on June 1st, 2008.  Did you wait until June 10 of '09 to

18    file bankruptcy to avoid any issues relating to your

19    pledging this stock or signing those documents?

20         A      Did I wait?

21         Q      Yes, sir.

22         A      I could do it any time.  I could do it now,

23    but that was just what happened.

24         Q      Why did you wait over a year from when you

25    signed these documents to file bankruptcy?

```
 1         A    Because I didn't get any more work.  I lost
 2    everything that I could have done in the fall.  And when
 3    we stopped racing in May, I had no more work at all.
 4         Q    When did you first meet with a bankruptcy
 5    attorney?
 6         A    I met with him the first time I did it.  I
 7    have known Steve since that length of time.
 8         Q    You met with who?  You said him.
 9         A    Steve Goerke.
10         Q    The record doesn't reflect who him is.
11         A    I'm sorry.  Steve Goerke did my first
12    bankruptcy.
13         Q    Right.  I understand.  That was '92?
14         A    Right.
15         Q    When did you meet with bankruptcy counsel for
16    purposes of your current bankruptcy for the first time?
17         A    I don't remember, and the reason I say that
18    is I probably knew by the end of the year once we had
19    gotten notice I wasn't going to be working by December
20    that I was going to have to file a bankruptcy.  I think
21    Jim had prepared things because I was in trouble, but
22    that's as best I can do.  I don't think I called -- I
23    don't know when I called Steve.  Probably around that
24    time.
25         Q    What time?
```

1          A       The end of the year, December or January,

2    because I met -- I'm trying to think where I was living

3    at the time.  I think I was in trouble and moved back and

4    that's when I called Steve.

5          Q       Have you challenged the tax assessed value

6    for the 885 property?

7          A       I have.

8          Q       When?

9          A       I think Saturday night or Sunday night to be

10   honest with you I called them.  Last year they told me

11   that it was too late when I challenged them.  So they

12   said it had to be done this year in the time frame.  I

13   actually spoke to a gentleman in the tax authority office

14   on Friday.  He instructed me what to do and how to do it

15   and to put it into via the Internet.

16         Q       Can you send me a copy of whatever you sent

17   them?

18         A       I'll be glad to.

19         Q       What do you recall as asserting the value?

20         A       I honestly have not done that yet.  The first

21   part of this challenge, this is my first time doing it,

22   is to put it in.  After -- I think they ask for

23   forty-eight or a certain amount of time before they

24   upload any information.  They have asked for the tax

25   roll, how I feel its assessed value at this time and

1    that will be forthcoming.

2         Q    Have you hired an appraiser to testify at

3    that hearing?

4         A    No.   The hearing hasn't been set yet, number

5    one.  And the cost of a commercial appraisal is

6    outrageous.

7         Q    I know your attorney sent a letter to Mr.

8    Rider I guess relating to the transfer of the property to

9    Mr. Aragona?

10        A    Can I see the document.  You are asking me a

11   question that I'm --

12        Q    Sure.  Here you go.

13        A    Steve satisfaction -- Mr. Rider was

14   Mr. Aragona's attorney, and Steve had contacted him

15   asking for a description because it was unclear and I

16   couldn't explain to Deborah what I was doing so they

17   asked him to clear up what he had done.  This is the

18   statement he had sent them.

19        Q    Okay.

20        A    I have never met Mr. Rider.

21        Q    You recall that you specifically signed over

22   a quitclaim deed on that property?

23        A    Yes.

24        Q    Do you know if your attorney received

25   anything in response to this?  He's asking if there is a

1   written agreement that memorializes that the quitclaim

2   deed was executed in consideration of the original

3   mortgage loan on the properties.  Have you received

4   anything?  I'm trying to determine if he has given you

5   any credit towards any debts that you may have owed.

6       A       He gave me a credit of ten thousand dollars

7   on the note that I signed for thirty-eight thousand.

8       Q       Is there anything that you have in writing

9   that reflected that?

10              MR. GOERKE:  That's the response we got to

11          the letter.

12              THE WITNESS:  I have supplied the note.  It

13          is part of -- unsecured loan is documented here on

14          page twenty and a note was signed and supplied to

15          the trustee for thirty-eight thousand and eighty

16          dollars that I had signed.

17  BY MR. BAKST:

18      Q       Okay.  The copy I had seen of the note I

19  think was unsigned.  You believe there is one signed?

20      A       I have personally signed that note.

21      Q       Do you recall when?

22      A       No.  The date that it had to be done prior to

23  the closing so probably that date.

24      Q       Do you know if there is documentation

25  demonstrating the fact that you do owe a hundred fifty

1    thousand dollars other than the actual note itself to

2    885?  I mean, for example, would you be able to reflect

3    in any of those bank records either from 885 or within

4    your records where you received that amount of money from

5    them?

6         A    I have supplied to the trustee a statement

7    from the 885 Quick Books program showing the dates and

8    check numbers that I had taken money and then returned

9    money.

10        Q    Do you recall when that was sent?  I have

11   everything the trustee received unless you think it

12   was -- was it on a CD?

13             MR. GOERKE:  It should be in both.  That's

14        one of the documents.  You should have two.

15             MR. BAKST:  I have seen a Quick Books

16        printout, but I don't have bank records.

17             THE WITNESS:  It would correspond to the

18        banking records and the cancelled checks.

19   BY MR. BAKST:

20        Q    I have a Quick Books printout that shows --

21        A    May I look at it?

22        Q    Sure.

23        A    This is the printout, check numbers, dates,

24   and amounts that I put in and deposited back.  The

25   seventy-five hundred came in June 1, 2008.  I'm glad you

1    asked me this question.  I'm seeing here that I don't

2    know what this is.  July 30, 2008.  Michael, you asked me

3    a question earlier about had I made any other

4    contributions back to it, to 885.  Here is one here from

5    Homes of Distinction.  I don't know the reasoning for it,

6    but there is a seventy-five hundred dollar one there and

7    then the small ones, the amounts of two hundred dollars

8    per month, the twenty-one eighty-four, the twenty-four

9    hundred, these are not cash amounts.  Those are transfers

10   because in lieu of me being paid for the services of

11   rental renewals, I'm forfeiting those back to the company

12   against the debt.

13             MR. BAKST:  I'm marking this as Exhibit 6.

14             (Whereupon, Trustee's Exhibit Number 6 was

15        marked for identification.)

16   BY MR. BAKST:

17        Q     Forfeiting what back to the company's

18   debts?

19        A     As a realtor, when I did the leases that are

20   in place, I'm paid a commission on a yearly basis.  I

21   have not taken those commissions.  I have put them back

22   to the company against what I owe.

23        Q     This breakdown reflects -- well, it starts

24   January '07, deposit, Homes of Distinction, a hundred

25   twenty-seven thousand five hundred dollars.  That's money

```
 1    back?  This looks like it's an ongoing account.
 2         A     It's been an ongoing account, and there was a
 3    time we zeroed I believe, but I'm not sure when that
 4    was.
 5         Q     This looks like as of the end of '07 looks
 6    like it was two thousand three oh nine.  Then it
 7    increases to thirty-five thousand to you on 12/17/07?
 8         A     I believe thirty-five thousand went to
 9    them.
10         Q     Went to them?
11         A     Is it parentheses or cash to me?
12         Q     It looks like cash to you.  Look at December
13    17, '07.
14         A     Sold a property and put the hundred five into
15    zero, and I had to borrow thirty-five thousand.
16         Q     What happened to the thirty-five thousand?
17         A     It went into operating account more than
18    likely.
19         Q     There are various amounts here.  Some say
20    you, some say Homes of Distinction, some say Royalty
21    Title?
22         A     Correct.
23         Q     Anything that went to either you or any of
24    your companies, you treat as a loan to you; is that
25    correct?
```

1        A        Yes.

2        Q        You signed a loan apparently in June of '08.

3   It looks like the balance of June 1, that day, was a

4   hundred nineteen thousand.  You signed a note for a

5   hundred fifty.  Let me show that to you.

6        A        Okay.

7        Q        Why is that?

8        A        Because if you go back at that particular

9   time, I believe, I can't tell you this exactly, I think

10  they were not always in the same category.  I believe

11  that Homes of Distinction owed some money.  I know that

12  twelve thousand dollars was owed by Royalty Title up

13  until June 1st, and I moved it.  So I'm not sure

14  exactly -- it was that much owed.  It was not an

15  exaggerated amount.  I don't know how exactly we came for

16  it that date.  I think Jim gave me direction as to what

17  to do.

18       Q        Can I see that please?

19       A        Uh-huh.

20       Q        The balance on that date, that date being

21  June 1, was a hundred nineteen thousand three oh nine

22  ninety-one.  Let me go through the rest of your schedules

23  and statement of financial affairs, if I can please.

24  Will you turn to Schedule I, if you would.  It's page

25  twenty-four of forty-six.

1       A       Okay.

2       Q       This lists your income on the day you filed

3  bankruptcy, what your monthly income was.  Is that

4  correct?

5       A       Was that for the year?

6       Q       No.  It appears to be your monthly income.

7       A       It might have been the gross income based

8  with the horses at that time.

9       Q       What is it now?

10      A       For August, I billed out gross twenty-two

11 hundred.  I think I made four hundred at the real estate

12 office so about twenty-five hundred dollars gross.

13      Q       Your expenses on Schedule J, being the next

14 page, do these appear to be the same?

15      A       Well, the top part, yes.  When you get into

16 number sixteen, the expenses are based on the amount of

17 horses I'm doing.  So you are feeding how many horses.

18 And no, obviously, it would not be forty-eight.  The

19 expenses on the two thousand twenty, whatever it is going

20 to be, is probably going to be closer to thirteen,

21 fourteen hundred dollars.

22      Q       Let me ask you to turn to page twenty-eight

23 of forty-six.  This is your statement of financial

24 affairs.  Did you read these pages which consist of page

25 twenty-eight of forty-six through page thirty-six of

1    forty-six before you signed them?  You are reading to

2    yourself.  I need to find out, did you read these pages

3    before you signed them?

4         A    I had read them.  I have seen them.  I

5    supplied the information.

6         Q    Are they accurate as of today?  Well, as of

7    the day you filed bankruptcy, was this information

8    correct?

9         A    I see one very small discrepancy.  I'm not

10   sure exactly.  It's just how it is.  Lulu's Place I think

11   we actually got closed by December 31st of 2005.

12        Q    That's referring to question -- what number

13   are you referring to, sir?

14        A    How about page thirty-four top.

15        Q    You are looking at looks like part of

16   question eighteen as to when Lulu's Place closed?

17        A    I believe it was December 31st.  I think we

18   got it done by that time.

19        Q    Is everything else accurate?

20        A    We have a typo.

21        Q    Where?

22        A    Same section, sole proprietorship, race horse

23   training business, bought and sold horses, s-o-l-d,

24   instead of s-o-l-e.

25        Q    Anything else?

1   A  I believe everything is correct.

2     MR. GOERKE:  We will include changes that

3   comply with testimony.

4 BY MR. BAKST:

5   Q  Why don't we go to page thirty-one of

6 forty-six, if you would?

7   A  Okay.

8   Q  Question ten.  I want you to read question

9 ten to yourself, and then I want you to tell me whether

10 or not you believe your answer is correct.

11   A  Okay.  I believe I understand it, and I

12 believe it's correct.

13   Q  You list here within two years of the

14 bankruptcy you transferred 885 Realty Group, you pledged

15 shares of the corporation to cover loans made and future

16 loans made to debtor by company.  You think that's a

17 transfer that occurred within two years of the

18 bankruptcy, that's one that you list.  You indicate that

19 you transferred to Mr. Cleary, it doesn't give a date,

20 but you transferred some time within that two years a

21 Ford pick up and 2000 Legend trailer used as

22 collateral?

23   A  I'm sorry.  The other trailer should have

24 been listed in there too.

25   Q  It says approximate value of truck and

1  trailer at the time of pledge was thirteen thousand?

2      A      Uh-huh.

3      Q      You understand what the purpose of this

4  question is?

5      A      I'm confused by it, but I'm sorry.

6      Q      Well, what is your education?

7      A      Twelfth grade.

8      Q      You have a high school diploma?

9      A      That's it.

10     Q      You have been employed as a realtor for how

11  many years?

12     A      Twenty.

13     Q      You passed the exam to be a realtor?

14     A      I did.

15     Q      This asks you to list all other property

16  other than property transferred in the ordinary course of

17  the business or financial affairs of the debtor,

18  transferred either absolutely or as security within two

19  years immediately preceding the commencement of this

20  case.   Do you understand what I just read to you?

21     A      I think I do.   I'm not sure, Michael.   I'm

22  sorry if I'm missing something.

23     Q      Why did you not disclose your transfer of

24  2650 North Mulberry which you sold in January of 2009?

25  Why was that not listed here?

```
 1        A       Because I thought it was ordinary business.
 2        Q       So you knowingly were aware of that but did
 3   not list it because you believe it's within your ordinary
 4   business to sell that particular property when you did?
 5        A       Yes.
 6        Q       That's because you normally -- well, let me
 7   ask.  How many properties of yours do you sell as a
 8   realtor?
 9        A       Of my own.
10        Q       Yes, sir.
11        A       I have sold quite a few.
12        Q       Within the last two years of the bankruptcy,
13   how many other properties have you sold?
14        A       Not as many, and that's -- I mean I sold the
15   land.  I sold that.  See the problem, probably the
16   confusion, if you are asking me directly about the short
17   sale, for me that's common course of business over the
18   last two to three years.  Most homes don't sell unless
19   they are short sold.  So I'm confused.  I'm sorry.  I'm
20   not getting what you are trying to --
21        Q       I'm trying to find out why you did not
22   disclose a transfer is what I'm asking you.
23        A       Because I thought it was ordinary course of
24   business and financial affairs I sold the property.
25        Q       Why didn't you disclose the transfer of a
```

1    horse in February '09 for four thousand dollars?

2          A      Didn't consider it property.

3          Q      I'm sorry?

4          A      I don't consider it property.

5          Q      You sold it for four thousand dollars?

6          A      A horse -- again, I'm a realtor.  I'm

7    thinking property is tangible property.  I'm not

8    foreseeing a horse as that.  I'm sorry.  I don't

9    understand the question.

10         Q      You transferred your interest in GJTT in June

11   of '08 for ten thousand dollars.  Why wasn't that listed

12   there?

13         A      Because it was a short sale.  I had to get

14   out of it.

15         Q      A short sale.  You sold an interest in a

16   company?

17         A      Uh-huh.

18         Q      For that amount of money?

19         A      Uh-huh.

20         Q      It's your position that was a short sale,

21   your sale of an interest in a business?

22         A      It was an arm's length transaction, and it

23   was a sale.

24         Q      Yes, sir.  For example, you list that you

25   pledged shares of a corporation to cover loans.  You

1   reference that as far as 885.  I'm trying to determine

2   why you didn't list that you also transferred an interest

3   in GJTT for ten thousand dollars?

4       A    Because it was a final sale.  I have no

5   interest in GJTT any longer.  That was a final sale.

6       Q    For 885 Realty, you disclose pledging shares

7   but you didn't disclose on June 9, 2008, you transferred

8   seventy-five hundred dollars to 885.  Why wasn't that

9   listed?

10      A    I didn't know it had to be in that depth.  I

11  don't understand.

12      Q    In that what, I'm sorry?

13      A    The depth of it.  I don't understand it.

14      Q    When you say the depth of that, can you

15  explain what you mean by that to me?

16      A    Well, you are asking me about the

17  seventy-five hundred dollars.

18      Q    Yes.

19      A    I don't understand what you are really asking

20  me.  Just call me stupid.  I'm sorry.  I don't understand

21  what you are asking.

22      Q    One of my jobs as attorney for the trustee is

23  try to determine if I think you have explained your

24  assets away, if you have been able to document your

25  business affairs, if I think either on your schedules,

1  statement of financial affairs or any time under oath

2  whether you have given any false oath in this case.  You

3  signed these papers under penalty of perjury.  You

4  represented they were true and correct when you signed

5  them.

6      A     Uh-huh.

7      Q     The trustee examined you at your first

8  meeting of creditors, and she asked you the same

9  question, did you read them before you signed them, are

10  they accurate, and I'm sure you said yes.

11      A     Uh-huh.

12      Q     I asked you again today.  I went through with

13  you all of these pages.  I asked you to read through them

14  and verify for me and read through your statement of

15  financial affairs again and read through it and verify

16  it.  And I asked you to read through question ten again,

17  and I asked you to confirm that was accurate.

18      A     Then I probably wouldn't pass a competency

19  test.  I honestly don't understand it.  I thought it was

20  an arm's length transaction.  If that's what it is

21  considered in business affairs, in normal affairs, that's

22  what I'm attesting to.  If I'm missing the question, then

23  I need to start over again I guess.  I don't know.

24      Q     I don't know as far as when we look at the

25  statement --

1          MR. GOERKE:  Can we take a minute?

2          MR. BAKST:  Sure.

3          (Whereupon, a short recess was taken.)

4          MR. BAKST:  We are going to convene today.  I

5     don't know if I will need to conclude your

6     deposition or not.  I'll speak to your attorney

7     generally what I need.  Particularly we have seen

8     there is about a million two received beginning in

9     I think it starts '06 and five hundred of that was

10    received beginning of '07.  There is a lot of

11    money.  I know you have gone through a lot of

12    transactions.  If there is some type of breakdown

13    you can get to me, I can then share with the

14    trustee as to what happened to all of that money.

15         THE WITNESS:  It's there.  I'm telling you

16    it's there.  There is nothing left.  I gave the dog

17    away this week.  There is nothing left.

18         MR. BAKST:  I'll talk to your attorney.  Read

19    or waive?

20         MR. GOERKE:  He's going to waive.

21         MR. BAKST:  We are done for today, sir.

22         (Whereupon, the deposition was concluded.)

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

      I, the undersigned authority, certify that

TERRY R. EICHAS personally appeared before me and was

duly sworn.

      WITNESS my hand and official seal the

_4_ day of _May_ , 2010.

_Janice L. Mamino_

JANICE L. MAMINO

JANICE L. MAMINO
MY COMMISSION # DD 919678
EXPIRES: December 21, 2013
Bonded Thru Notary Public Underwriters

CERTIFICATE

1

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4         I, Janice L. Mamino, certify that I was authorized

5    to and did stenographically report the deposition of

6    TERRY R. EICHAS; that a review of the transcript was not

7    requested; and that the transcript is a true and complete

8    record of my stenographic notes.

9         I further certify that I am not a relative,

10   employee, attorney, or counsel of any of the parties, nor

11   am I a relative or employee of any of the parties'

12   attorney or counsel connected with the action, nor am I

13   financially interested in the action.

14        Dated this _4_ day of _May_ ,

15   2010.

16

17

18        *Janice L. Mamino*

19             JANICE L. MAMINO

20

21

22

23

24

25