1

1      UNITED STATES BANKRUPTCY COURT
       SOUTHERN DISTRICT OF FLORIDA
2
       CASE NO.:  09-21514-BKC-EPK
3

4      In Re:

5      TERRY R. EICHAS

6          Debtor.
                                              /
7      DEBORAH C. MENOTTE, Trustee in
       Bankruptcy for Terry R. Eichas,
8
           Plaintiff,
9
       vs.                  Adv.Proc.No.: 09-02182-BKC-EPK
10
       TERRY R. EICHAS,
11
           Defendant.
12     _____/

13

14

15     DEPOSITION OF:          STEVEN G. GOERKE

16     TAKEN AT INSTANCE OF:   The Trustee

17     DATE:                   July 26, 2010

18     TIME:                   1:35 p.m. - 4:52 p.m.

19     PLACE:                  222 Lakeview Avenue
                               Suite 800
20                             West Palm Beach, Florida

21

22

23

24            SUN COAST REPORTERS
               P. O. Box 221164
25        West Palm Beach, Florida 33422
               (561)640-9621

```
 1   APPEARANCES:

 2   On behalf of the Trustee:

 3   MICHAEL BAKST, ESQUIRE
     Ruden, McClosky, Smith, Schuster & Russell
 4   222 Lakeview Avenue, Suite 800
     West Palm Beach, Florida  33401
 5
     On behalf of the Debtor:
 6
     ALAN CRANE, ESQUIRE
 7   Furr and Cohen
     2255 Glades Road, Suite 337W
 8   Boca Raton,  Florida  33431

 9   Also Present:

10   Terry R. Eichas

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              <u>INDEX</u>
   EXAMINATION
2
   Witness Name                                          Page
3  STEVEN G. GOERKE
       Direct By Mr. Bakst ................................. 4
4      Cross By Mr. Crane ................................. 64

5  EXHIBITS

6  Exhibit                                               Page
   Trustee's Number 1 Marked for Identification          16
7  Trustee's Number 2 Marked for Identification          38
   Trustee's Number 3 Marked for Identification          55
8  Trustee's Number 4 Marked for Identification          55
   Trustee's Number 5 Marked for Identification          58
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          The deposition of STEVEN G. GOERKE taken at

2     the instance of The Trustee, on oral examination,

3     pursuant to notice, commenced at 1:35 p.m., on July 26,

4     2010, at 222 Lakeview Avenue, West Palm Beach, Florida

5     before Janice L. Mamino, Notary Public in and for the

6     State of Florida at Large.

7                       - - -

8     WHEREUPON,

9                     STEVEN G. GOERKE

10    after being first duly sworn, was examined and testified

11    as follows:

12                    DIRECT EXAMINATION

13    BY MR. BAKST:

14         Q     Would you state your name and business

15    address for the record please?

16         A     Steven Goerke, G-o-e-r-k-e, 5300 West

17    Atlantic Avenue, Suite 412, Delray Beach, Florida

18    33484.

19         Q     Mr. Goerke, my name is Michael Bakst.  We met

20    before.  I'm an attorney representing Deborah Menotte.

21    Miss Menotte is the Chapter 7 trustee in bankruptcy for

22    Terry Eichas.

23               Our understanding is at one point you were

24    the attorney representing Mr. Eichas on a Chapter 7

25    bankruptcy that he filed.  Is that correct?

1       A     There were actually two, yes.  I represented

2    him in two 7s, one a long time ago and one about a year

3    ago, yes.

4       Q     Are you currently admitted to practice law in

5    the State of Florida as an attorney?

6       A     Yes.

7       Q     How long have you been an attorney?

8       A     I got admitted in 1985.

9       Q     Are there any particular fields in which you

10   specialize?

11      A     Well, I'm board certified as a civil trial

12   lawyer.

13      Q     Do you practice in bankruptcy court?

14      A     On occasion.  I used to do it a lot more, but

15   I do as the business comes in.

16      Q     What percentage of your practice would you

17   say is bankruptcy related?

18      A     That's hard to answer because I think all of

19   my cases are bankruptcy related to some extent.  Whether

20   I'm suing someone or not suing someone, I think the

21   bankruptcy comes into play.  As far as actually filed

22   cases, as it stands now, I have no filed cases.

23      Q     But other than Mr. Eichas's case, you have

24   filed other bankruptcy cases, say, since the year '05?

25      A     Yes.

1       Q       You mentioned you filed a previous bankruptcy

2   for Mr. Eichas.  Do you recall when that was?

3       A       1995 pops in my head, but I couldn't be

4   accurate.  I don't know whether that's accurate or not,

5   but I think about fifteen years ago.

6       Q       The current bankruptcy was filed I believe on

7   January 14, 2010.  No.  That's wrong.  Give me one

8   second.  I'll give you the exact date.  June 10, 2009.

9   Does that date sound about right to you?

10       A       I believe it was in June of '09.  I couldn't

11   tell you the date.

12       Q       We had asked you to be here today to take

13   your deposition in regard to an adversary proceeding

14   filed against Mr. Eichas objecting to his discharge.  You

15   were asked to bring certain documents with you.  I would

16   like to ask, have you seen the notice for today?

17       A       Yes.

18       Q       Have you compiled the documentation that is

19   on the exhibit list?

20       A       I have my entire file that has anything to do

21   with Terry Eichas that I had possession of which

22   includes -- most of it is on disk, a lot of the financial

23   information.  There was a tremendous amount of financial

24   information on disk.  I have all of the papers, all of

25   the communications between anyone relating to this file.

1    I also have the Bar file that he filed a Bar complaint

2    against me.  And I have an old file that was

3    approximately a year before the filing.

4         Q     Do you have anything in paper form today with

5    you?

6         A     Yes.

7         Q     Can you show me what you do have in paper

8    form?

9         A     I have to object and get a resolution of what

10   the attorney-client privilege is or some kind of

11   resolution.  I have no -- I have the box here.  I'm

12   certainly willing, but I think I'm obligated to object to

13   raise the attorney-client privilege and then hopefully

14   you guys can work on how to get around various issues or

15   I think the only time the attorney-client privilege -- if

16   it was a privileged document would be if there was a

17   definite assertion of wrongdoing on my part on a

18   particular issue, I believe I can respond to that.

19        Q     I think that particularly since the debtor is

20   here, his attorney can raise any privilege.

21             MR. BAKST:  I guess first thing is he going

22        to assert privilege as to Mr. Goerke?

23             MR. CRANE:  Not a blanket privilege.  There

24        are certain things that are in the file that I

25        think are not privileged.  I think that there are

1    documents that are.  I read the transcript.  I have

2    read the Bar complaint.  It's our position that

3    there is no blanket waiver contained in any of

4    there.  So if you are asking about documents that

5    Mr. Goerke requested Mr. Eichas to produce in

6    preparation for the bankruptcy and those documents

7    as long as they were not specifically created, you

8    know, for Mr. Goerke, you know, so the difference

9    would be if Mr. Eichas wrote a letter or gave him

10   some information that he created just for

11   Mr. Goerke, I think that would be a privilege

12   issue.  And then it would depend upon what is in

13   there as to whether or not I would assert it from

14   there.

15        MR. BAKST:  You have seen docket entries that

16   were filed by your client, ten and eighteen.

17        MR. CRANE:  Yes.

18        MR. BAKST:  In the adversary proceeding.

19   What we will do is I think the proper way to

20   proceed is if you want, why don't you give

21   everything you have to Mr. Crane today, I'll take a

22   break, and go through it and everything you think

23   is privileged why don't you take out.  We will

24   separately -- I guess it will become part of a

25   privilege log.  We will have the judge rule on

1    that.  But at this point, I think you need to

2    provide all of the documents.  I'll leave the room

3    so that your former client can determine what he

4    thinks is privileged and the court will rule on

5    that, and we will go forward today as to what is

6    not claimed as privileged and do it.  I guess it

7    will probably be two steps.

8         THE WITNESS:  He has a copy of my entire

9    file.  I think the only thing I did not give him a

10   copy of was the Bar complaint file.

11        MR. BAKST:  Okay.  Well --

12        THE WITNESS:  I don't know how to do it.

13        MR. BAKST:  If you have the file now, I

14   guess --

15        THE WITNESS:  I have the file with me.

16        MR. BAKST:  Why don't you hand it to

17   Mr. Crane.

18        THE WITNESS:  This is my original file.  We

19   can be sure that the original file is coming back

20   to me at some point in time?

21        MR. BAKST:  We can handle this however you

22   want.  We can have the -- it's up to you if the

23   court reporter makes a copy or if -- I'll leave it

24   up to --

25        MR. CRANE:  On the documents that are not

1    privileged that we are -- let's see.  Why don't we

2    make two stacks.  My feeling is that on the

3    documents that are not privileged and we are having

4    no dispute on, then you can do whatever way you

5    want.  My suggestion would be on the documents that

6    we are -- that we are claiming as privileged is

7    that those probably should go to a copy service as

8    long as we are agreeing that my giving it to a copy

9    service is not waiving the privilege.

10        MR. BAKST:  Okay.

11        MR. CRANE:  The copy service can make sure

12   that you get your originals back and then we get

13   copies.  Then I guess we are going to have to

14   figure out with the judge as to how the judge wants

15   us -- if he wants to review under seal, if we need

16   to argue about it.

17        MR. BAKST:  I'm sure it's something we will

18   have to have an in camera hearing and the judge can

19   decide.

20        MR. CRANE:  However you want.

21        MR. BAKST:  At this point, do you want to

22   hand everything to Mr. Crane and he will hand

23   things to me.

24        THE WITNESS:  There are two disks in here.  I

25   believe the one that says Terry Eichas is the disk

1     that I gave you during the proceeding that should

2     be an identical copy to the disk I gave you, and

3     the Eichas financials I believe has additional

4     items such as tax returns and things that were in

5     my computer, and that represents the documents I

6     gave him.  I gave him all of the financials.  This

7     should just be financial information provided to me

8     by Mr. Eichas, and then there are papers in the

9     file.

10          MR. BAKST:  Okay.  Why don't we start with

11     the papers in the file today.  I guess at some

12     point Mr. Crane can review what is on those disks

13     and tell us what is privileged or not, if there is.

14     Do you want to make arrangements between

15     yourselves.  I don't know that you want me putting

16     it on a computer here.  I guess you guys can

17     arrange that.  Why don't you hand the papers that

18     you have, if you would, to Mr. Crane.

19          THE WITNESS:  Okay.  I'm just removing

20     documents that I met with another attorney

21     upstairs.  It's a different file.  That should be

22     everything I could find.  What I have in here is I

23     believe I have a copy of the Bar complaint file,

24     and I have a copy of the -- there was a file

25     approximately a year before the filing.  I think I

1    have a copy of that file in this.  I don't have the

2    original.  That's what I have.

3         MR. BAKST:  I'll let Mr. Crane go through it.

4    I guess what we will do is I'm going to take a

5    break.  I'm not going to sit here while you go

6    through every piece of paper.  I would ask you to

7    set aside those items you think are privileged.  We

8    will identify them however we can on the record as

9    an e-mail from whatever date, however you want to

10   do it, so we know what that is, and we will address

11   as far as the copies.

12        MR. CRANE:  Okay.

13        (Whereupon, a recess was taken.)

14        MR. BAKST:  Back on the record.  We have been

15   off the record about an hour and a half while

16   debtor's counsel has gone through documents

17   produced.  I have a stack here that is about ten

18   inches tall of papers, and then there is a group

19   that debtor's counsel has.  The pages are -- how

20   many pages do you think are there; about a hundred,

21   a hundred fifty?

22        MR. CRANE:  It's about two inches.

23        MR. BAKST:  What we need to do I guess to

24   expedite this since we have to get a court ruling

25   on that group anyway, and I quite frankly don't

1   want to go through and ask questions twice, at

2   least as to documents today, why don't you put that

3   in some type of envelope and take it with you and

4   prepare a privilege log of all of the documents in

5   there because that's what you have to have, and

6   then I'll file a motion I suppose to -- I guess

7   motion to compel or something of that nature and

8   have the court rule on that.  Is that okay,

9   Mr. Goerke, with you, that procedure?

10          THE WITNESS:  I just want my original file

11   back.  Whatever you guys -- I tried to resolve this

12   in advance by doing whatever I could, but in this

13   case, I need the original file back.

14          MR. BAKST:  I understand and I appreciate

15   that.  Is it okay if Mr. Crane takes these to

16   prepare the log?

17          THE WITNESS:  I don't know Mr. Crane, but I

18   trust Mr. Furr explicitly.

19          MR. CRANE:  If you want, I'm okay with you

20   taking -- Mr. Goerke, you taking these, sending --

21   I'll arrange for a copy service to come by and get

22   the stack and then give me the copy and you the

23   original.  It doesn't matter to me.

24          MR. BAKST:  You two can decide that.

25          THE WITNESS:  I suppose I would rather have

1    the documents with me.

2         MR. BAKST:  You take them before we leave

3    today.  We will try to keep those together.

4         MR. CRANE:  Do you have an envelope?

5         MR. BAKST:  Yes, I'll get one.

6         THE WITNESS:  Can I correct one answer.

7    Earlier I said I had no pending cases.  I meant

8    Chapter 7.  I have one 13, and I represent

9    creditors in a couple of Chapter 11s.

10        MR. BAKST:  Okay.  Let me ask you.  Are the

11   bankruptcy work sheets if there are any of the

12   debtor in either stack?

13        MR. CRANE:  Let me see.  There are no per se

14   work sheets.  There were schedules that went back

15   and forth like, how shall I say, draft schedules

16   halfway completed or partially completed and marked

17   up.  Those schedules are in your stack.

18        MR. BAKST:  These are drafts, but not any

19   actual work sheets at least from what you have seen

20   in the documents?

21        MR. CRANE:  Correct.

22   BY MR. BAKST:

23        Q    Mr. Goerke, is that your understanding as

24   well?

25        A    I don't use work sheets.  I sit personally

1   with each person and sometimes we send drafts back and

2   forth.

3           MR. BAKST:  Is the Bar complaint file in what

4       has been provided to me?

5           MR. CRANE:  Yes.

6           MR. BAKST:  Are these in any particular

7       order?

8           MR. CRANE:  I took them out of Mr. Goerke's

9       box, put them face down into two piles, one that

10      you have and one that I have.

11          MR. BAKST:  Okay.

12          THE WITNESS:  I believe the Bar complaint is

13      the folder at the bottom.

14          MR. CRANE:  I tried not to mix them up.  I'm

15      not going to promise you anything.  But that was my

16      intent.  But there are a lot of documents going

17      back and forth.

18  BY MR. BAKST:

19      Q   Mr. Goerke, I'm going to mark as Exhibit 1 a

20  copy of the schedules that have been filed with the court

21  and ask you, does this appear to be a true and correct

22  copy of the schedules that you believe were filed?

23          Here is an extra copy, Mr. Crane.

24      A   Not going item by item, I would say this

25  appears to be the program that I use and the forms that

1   come out.

2           (Whereupon, Trustee's Exhibit Number 1 was

3       marked for identification.)

4   BY MR. BAKST:

5       Q     Did you meet with Mr. Eichas yourself in

6   regard to his first decision to file the bankruptcy?

7       A     The answer to that is I met with him and

8   where in point in time the decision to file a bankruptcy

9   came along, I'm not sure.

10      Q     Okay.

11          MR. BAKST:  Off the record.

12          (Whereupon, an off-the-record discussion was

13      had.)

14  BY MR. BAKST:

15      Q     Let me ask, when were you first contacted by

16  Mr. Eichas for the purposes of discussing the possibility

17  of bankruptcy filing?

18      A     That's all?  First of all, I'm assuming we

19  are talking only the second bankruptcy.

20      Q     Yes, we are.

21      A     Okay.  To the best of my recollection, I was

22  not contacted for the purposes of filing bankruptcy.  I

23  was contacted about a particular legal issue that he had,

24  and then I offered up as a possibility a bankruptcy

25  filing.

1        Q      When was this first meeting?

2        A      Approximately the spring of 2008.

3        Q      How many times did you meet with Mr. Eichas

4  between that date and the time that he actually filed

5  bankruptcy, if you recall?

6        A      He likes to call on the phone so we spoke on

7  the phone maybe fifty to a hundred times before the

8  filing, but I would say we met in person I can only think

9  of -- and, again, we met -- I remember having lunch with

10  him, but I don't remember that we met for the purpose of

11  bankruptcy.  Terry is somebody that I had known years ago

12  and I didn't really know him well, but I -- you know,

13  between the fifteen years ago when we filed the first one

14  and this one, I have had some telephone contact with him.

15  So it was, you know, I found him to be friendly, and we

16  had lunch.

17              Now did we have lunch for the purpose of

18  filing bankruptcy or did we have lunch for the purpose of

19  finding out what was going on in each other's life, but I

20  do remember having a lunch meeting.  I certainly remember

21  meeting in the office prior to the bankruptcy filing at

22  least twice.

23        Q      How many phone calls did you say you had?  I

24  thought you said fifty to a hundred.

25        A      It's hard to say because he likes to call.

1    He's very on top of things.  So I mean there were a lot

2    of calls.  I mean many, many, many calls.

3         Q    For what purpose was he calling you?

4         A    He wanted to stay on top of things.  But as

5    far as the pre-bankruptcy filing goes, we had the

6    original meeting, there were some phone calls regarding

7    that, and every once in awhile he would call to just

8    check in, let me know what was going on.  And then before

9    the filing, there were exchange of calls back and forth

10   getting information, et cetera.

11        Q    You indicated earlier today that you would go

12   through the bankruptcy schedules or the forms with your

13   clients to prepare them; is that correct?

14        A    Yes.

15        Q    Did you do that with Mr. Eichas?

16        A    The procedure followed was send me your

17   creditors, okay.  With the list of creditors, I then

18   started to prepare the creditor information.  Then I

19   asked him for information regarding properties, and so I

20   have got information regarding properties.  I cannot

21   recall whether we went down item by item while he was

22   sitting in the office or it was probably a combination of

23   both.

24             I think you will see that there were drafts

25   that were volleyed back and forth.  I would scan them.  I

1    think there is two final drafts that were in there that

2    were distributed to him, and with those I would use

3    yellow and those were areas that needed focus.  I would

4    then scan them on my color scanner and then send them to

5    him or I think probably one of them and I think the other

6    one I handed to him.  When he was in the office, I would

7    have handed him a copy and kept the original.

8               But let's just say there were several, many,

9    discussions and a couple of meetings before the petition

10   was finalized.

11        Q    Were there any specific items that Mr. Eichas

12   asked you not to disclose on his schedules or his

13   statement of financial affairs?

14        A    No.

15        Q    I have in your file here appears to be a

16   draft of schedules.  I'll hand it to you.  Can you

17   identify this?

18        A    Yes.  This is one of the earlier drafts.  I

19   think in the pile, there were two drafts, and the yellow

20   was my highlighting.  Again, we went by stages.  So, for

21   instance, the highlight at the top of the statement of

22   financial affairs was to remind me that we have to do the

23   statement of financial affairs.

24        Q    These are unstapled, but is this another

25   draft of the schedules?

1       A       This might be a duplicate of the same.

2       Q       Do you want to see the last one?  Sure.

3   There you go.

4       A       Yes.  These are the same.  One of them would

5   have been my copy, and one of them would have been one

6   that was printed out.  So it would have been an e-mail

7   that is attached to the front of that.

8       Q       These two are the same?

9       A       Yes.

10       Q       I'll put this back in the group.  I'll scan

11   it.  There is not really a date on this that I can locate

12   so far.  The highlighting I don't know if that is going

13   to copy, but there is nothing I can do about that.  I see

14   a copy of a retainer agreement from May 18.  Do you have

15   a signed copy somewhere?

16       A       I cannot locate the signed copy.

17       Q       Looks like another draft with some

18   handwriting on it.  Is this a later draft of the

19   schedules?

20       A       I think that might have a date on it.

21       Q       It does, June 4 of '09.

22       A       That would have been one of the additional

23   drafts, yes.

24       Q       Do you know whose handwriting that is?

25       A       That is my handwriting.

1    Q    For what purpose were those pages prepared?

2    A    This would have been -- well, the first one,

3    statement of financial affairs number one, would have

4    been questions that I had regarding the filling in of the

5    schedules or that I had discussed with Terry, and this is

6    a calculation of current income which would have been

7    done prior to the filing.  And I would have gotten the

8    information from Terry.

9    Q    Okay.  Thank you.  There is e-mails from an

10   address t-r-e-h-o-d at gmail.com.  Do you recognize that

11   as Mr. Eichas's e-mail address?

12   A    Yes, I do.

13   Q    We have bank records for t-r-e horse account.

14   What was your understanding as to what this account was

15   used for, if you know?

16   A    In what time frame?

17   Q    Say within the year '09.

18   A    At the time I filed it, it was my

19   understanding that Terry was taking care of some horses

20   and that he would get paid a small fee and then he would

21   pay the expenses of taking care of the horses.

22   Q    Were you ever made aware of whether

23   Mr. Eichas had sold, transferred or given away any horses

24   within two years before filing bankruptcy?

25   A    I remember subsequent to the bankruptcy

1    filing an issue that we had discussions about horses.

2         Q      You recall that coming up after the filing?

3         A      Yes.

4         Q      Before the filing, did that issue come up at

5    all?

6         A      Did I ask him if he had horses?  Are you

7    objecting?

8              MR. CRANE:  Give me a minute to think.  Let

9         me go off the record with my client.

10             MR. BAKST:  Okay.  We can go off the record.

11             (Whereupon, a short recess was taken.)

12             MR. CRANE:  Can you re-read the question if

13        you don't mind.

14             (Whereupon, the requested portion was read

15        back by the court reporter.)

16             MR. CRANE:  Yes, I'll assert the

17        attorney-client privilege.

18             MR. BAKST:  Just so we are clear, the

19        attorney-client privilege being asserted as to

20        whether the attorney asked the debtor if he owned

21        horses prior to the bankruptcy filing?

22             MR. CRANE:  Let's see.  If the answer is just

23        going to deal with whether he knew that he had

24        horses prior to then, that's fine.  I don't need a

25        privilege for that.  Although, here is my concern.

1          Is that I start going down the road and I go down a

2          little bit, and then I have gone all of the way.

3          So I guess I am going to assert it and then the

4          judge will decide.

5               If you want to continue, probably -- the way

6          I understood it is continue asking your questions.

7          I'll assert the privilege.  This way we know where

8          it's going to go.

9               MR. BAKST:  Sure.

10   BY MR. BAKST:

11        Q     Did Mr. Eichas ever tell you that he had sold

12   horses before the bankruptcy filing?

13               MR. CRANE:  Assert the privilege.  Mr. Eichas

14          is asserting the privilege.  However you want to

15          say it.

16   BY MR. BAKST:

17        Q     Are you familiar with Patrick Cleary?

18        A     The name sounds familiar, yes.

19        Q     Do you recall how the name sounds familiar at

20   all?

21        A     I think it's one of the people that loaned

22   Terry money.

23        Q     There is an e-mail from June 12 of '09 in the

24   documents provided, the case was filed June 10 of '09,

25   from the trustee to you asking for the information as to

1    the Ford pick up and the title certificate.  Do you

2    recognize this?

3         A    Just reminds me of one thing.  There may be

4    e-mails to the trustee from a different e-mail address

5    that I was not able to copy.  It would only be the

6    original information supposed to be going to the trustee

7    because I at that time had trouble going into a Bell

8    South account.  So I think I did send her stuff from a

9    different e-mail, and it just would have been, here is

10   Mr. Eichas's tax returns or whatever.  That is something

11   I wrote.  Yes, that looks familiar.

12        Q    This appears to be to you from Miss Menotte.

13        A    Okay.  Then yes.

14        Q    Asking for information as to the Ford

15   supposedly surrendered to a creditor.

16        A    Yes, I remember receiving that.

17        Q    Do you recall sending information showing

18   that that vehicle had been surrendered to Mr. Cleary?

19        A    I don't remember ever getting documentation

20   regarding that.

21        Q    Did you seek the documentation?

22        A    Whatever e-mail came in would have been

23   forwarded immediately.

24        Q    When you say forwarded, forwarded to whom?

25        A    Mr. Eichas.

1    Q    Did Mr. Eichas ever respond by producing

2  documentation to support that?

3    A    I don't remember seeing any documentation

4  regarding the truck.

5    Q    Just so we are clear, the truck we are

6  talking about is on the statement of financial affairs

7  question ten.  Do you want to take a second to read that.

8  Do you understand that's the truck we are talking about

9  today?

10    A    Yes.  I remember saying that there was a

11  truck provided to Mr. Cleary before the filing.

12    Q    Why was that information put on the statement

13  of financial affairs?

14    A    Because in my -- we discussed the need to

15  disclose transfers.  And when he told me the truck was

16  being turned back to Mr. Cleary -- well, two different

17  things here.

18           First, this has to do with the fact that he

19  said that he put collateral -- what it was -- now I

20  remember.  He provided Mr. Cleary a truck and a trailer

21  as collateral for a loan.  Subsequent to -- just prior to

22  the filing, he then gave the truck back to one of the

23  lien holders.  I think it's Mr. Cleary.  There were a

24  couple gentlemen involved, and I don't remember which one

25  it was, but I do remember that he returned a truck to an

1    individual just prior to the filing.

2         Q    Is that what you were told by him?

3         A    Yes.

4              MR. CRANE:   Who is the him?

5              MR. BAKST:   Mr. Eichas.

6              MR. CRANE:   I object to privilege because I

7         didn't know who the him we were talking about

8         was.

9              MR. BAKST:   As to asking him as to those

10        facts on the truck.

11             MR. CRANE:   Well, those facts are in the

12        public record.

13             MR. BAKST:   So that's my --

14             MR. CRANE:   You have documents there I

15        believe in your file that would demonstrate the

16        same information.

17             MR. BAKST:   Then --

18             MR. CRANE:   I'm trying to sort it out in my

19        head.   To the extent that it's coming from advice

20        or information supplied or legal advice from Mr.

21        Eichas, I would object as to privilege except as I

22        said, the issue is that the same information is

23        public records and therefore would have been

24        supplied and re-supplied to your office.   So I

25        think you get the same information either way.   So

1        based on the fact that you have the information

2        based upon the public records, I'll withdraw the

3        privilege as to that issue.

4            MR. BAKST:  I guess he answered the question

5        so I guess that is moot.

6  BY MR. BAKST:

7      Q    Someone put a tab on it, but this is an

8  e-mail with an attachment.  I'll show you this first page

9  from Mr. Eichas to you, attachment says '04 truck sold

10  pdf.  This shows the sold date of the truck with a new

11  lien from Florida as of June 29, '09.  I'm sure wherever

12  Jack sold the truck they waited until they sold it before

13  changing the registration.  Let me show that to you.  Do

14  you recognize that?

15      A    This is an e-mail that I received, yes.

16      Q    What is your recollection as to how any of

17  this came up, the transfer of this truck?

18      A    I will answer --

19            MR. CRANE:  Go ahead.

20            THE WITNESS:  Can I tell him my understanding

21        of what happened with the truck, how I prepared the

22        schedules and what I believe that e-mail is?

23            MR. CRANE:  Yes.

24            THE WITNESS:  Okay.  I was told -- I was

25        asked, is it okay to give the truck back to Jack,

28

1        okay.  And I believe Jack to be Mr. Cleary.  To

2        which I said yes.  I was then told the truck was

3        given back.  Then there was a request for the

4        title, and it was like, we don't have a title.

5        This is confirming that as of this day, I was still

6        being represented that the truck was given back to

7        Jack, okay.  I subsequently found out something

8        else.

9   BY MR. BAKST:

10       Q      What did you find out?

11              MR. CRANE:  Now I will object.

12   BY MR. BAKST:

13       Q      How did you find out something else?  What

14   was the source of your finding out something else?

15       A      I don't recall if it was an issue from

16   your office.  I do recall seeing a new truck, and I

17   believe subsequent to that is when we had a discussion

18   about --

19              MR. CRANE:  Objection.  The question was how

20       did you find out, and I want to be careful about

21       the privilege issue.  I think you had asked --

22              MR. BAKST:  From what source.

23              MR. CRANE:  -- from what source, and you are

24       going on long past what the source was.

25

1    BY MR. BAKST:

2        Q     What was the source?

3        A     My only source for information regarding the

4    truck was Mr. Eichas.

5        Q     Did you observe Mr. Eichas driving a

6    different truck after the filing of the bankruptcy?

7        A     I saw him in a truck, yes.

8        Q     Was it the same truck you had seen him in

9    before he filed bankruptcy?

10       A     It was a new truck.

11       Q     Did you discuss that truck with Mr. Eichas?

12       A     Yes.

13       Q     Did that discussion at all involve facts

14   surrounding what he disclosed on question ten of the

15   statement of financial affairs?

16            MR. CRANE:  I object as to privilege.

17            MR. BAKST:  Just for the record, I'm going

18        through this stack quickly.  This is not -- I do

19        not intend for this to be comprehensive today since

20        we are going to be back here at some point

21        presuming once the court rules on documents.

22   BY MR. BAKST:

23       Q     Some e-mails between counsel and my office.

24   This looks like a copy of Schedule B, for some reason

25   it's separate, and some handwriting.  Do you know what

1    that is?

2         A      That's not my handwriting.

3         Q      Do you recognize whose it is?

4         A      I could match it up with the numbers.   The

5    only person it could be would be Mr. Eichas.

6         Q      Did you receive any documentation prior to

7    the filing of the bankruptcy filing disclosing the debtor

8    had sold a horse in February '09 for four thousand

9    dollars?

10        A      I didn't receive any documentation regarding

11   horses.

12        Q      Did you receive any documentation

13   demonstrating the debtor sold an interest in GJTT, LLC

14   for ten thousand dollars in June of '08?

15        A      I was aware of the corporate name because I

16   did a corporate search on him, and I would have asked him

17   about what happened to that.   And whatever information I

18   got would be in the schedules.

19        Q      Did he give you documentation relating to

20   that?

21        A      The sale of --

22        Q      His interest in that entity in June of '08.

23        A      I'm not sure that I got that information

24   prior to the bankruptcy filing.   I'm sure that we have

25   his GJTT file within the documents that were provided to

1    you.

2         Q       Were you provided with documentation

3    demonstrating seventy-five hundred dollars transferred on

4    June 9 of '08 to 885 Realty Group, LLC?

5         A       I -- what was the date?

6         Q       June 9, '08.  This case was filed June 10,

7    '09.

8         A       I didn't see multi years of bank statements

9    at that time.  We discussed what a transfer was, what

10   would make -- and came up with a list.  I relied on

11   him.

12        Q       When you did discuss question ten in the

13   statement of financial affairs with Mr. Eichas, did he

14   ever tell you there was anything he did not understand

15   about the question?

16               MR. CRANE:  Objection, privilege.

17   BY MR. BAKST:

18        Q       Did you discuss this question ten at all with

19   Mr. Eichas before the filing of the bankruptcy?

20        A       Yes.

21        Q       Was there any reason why this bankruptcy was

22   filed on June 10 as opposed to any other date, June 10 of

23   '09, as opposed to any other date?

24        A       In my mind, why it was filed then?

25        Q       Yes, sir.

1          A     Okay.  I had not been filing bankruptcies

2     because I did not believe in the economy and I didn't see

3     any point in filing bankruptcies until shall we say the

4     dust settled.  I was told to file the bankruptcy at that

5     time, and I was given a reason or multiple reasons.

6          Q     What were the reasons you were given for the

7     filing of the bankruptcy?

8               MR. CRANE:  Objection, privilege.

9     BY MR. BAKST:

10         Q     Were you given the reasons by Mr. Eichas?

11         A     Mr. Eichas is the only person I ever talked

12    with on this file besides your office or the trustee.

13         Q     The time that the reasons for the filing were

14    told to you, was it in person or on the phone?

15         A     I recall getting calls that I would -- that I

16    was supposed to file.  But he -- I also know he came

17    in --

18               MR. CRANE:  The question was, and I want to

19          be careful because of the privilege issue, normally

20          I wouldn't interrupt, but he asked you a very

21          specific question was it on the phone or was it in

22          person so stick to answering that.  He can ask the

23          follow up questions.  This way it will give me the

24          opportunity to object if I feel it's appropriate.

25               THE WITNESS:  I apologize.  It was probably

1          both.

2     BY MR. BAKST:

3          Q     In person and on the phone?

4          A     Yes.

5          Q     When he was on the telephone, was there

6     anybody else on the line?

7          A     No.

8          Q     Were you on a speaker phone either at your

9     office or where he was located?

10         A     No.

11         Q     When it was in person, was there anybody else

12    present with you?

13         A     No.

14         Q     I say with you.  I mean anyone present with

15    you and Mr. Eichas at the time?

16         A     I mean Mitch McRae may have been in his

17    office, but it's only Mitch McRae and I in the office,

18    and Terry would have came and met with me.

19         Q     Let me show you an e-mail from Mr. Eichas to

20    you from September 15, '09 subject given as horses

21    update.  Can you explain to me what your understanding of

22    this is?

23         A     At some point in time subsequent to the

24    filing, the issue of ownership of horses came up.  We

25    discussed that and at very lengthy -- shall we say we

1    discussed this case in a very lengthy meeting.  Again, I

2    don't know how far I can go.

3                  MR. CRANE:  That's about it.

4    BY MR. BAKST:

5        Q     What does this reflect?

6        A     My understanding is that's horses.

7        Q     Purchase date, purchase amount, it looks like

8    sales over to the right; correct?

9        A     I believe that's purchase and sales of

10   horses, yes.

11       Q     What was your understanding as to what

12   Mr. Eichas did for a living at the time that this

13   bankruptcy was filed?

14       A     At the time it was filed, he owned a real

15   estate company.  That was his primary business.  He also

16   took care of horses, and I don't remember at that time

17   whether he was a jockey or not.

18       Q     Were you ever under the impression that he

19   was in the business of buying and selling horses?

20                  MR. CRANE:  Objection, privilege.

21   BY MR. BAKST:

22       Q     Here is an e-mail from Mr. Eichas to you

23   saying check from CarMax was deposited into 885 Realty

24   Group account against loans on 11/18/08 for thirty-four

25   thousand five hundred dollars.  Do you recognize this

1   e-mail?

2         A     I recognize the e-mail.  For some reason, I

3   think the date is wrong, but I believe this was the sale

4   of a car where it says '05 Mercedes at the top.

5         Q     Right.  You think the date was wrong?

6         A     Something in -- because I seem to recall that

7   when we were talking about doing amendments or something

8   that the issue of this particular date was wrong, but I

9   could be wrong.  But I seem to think that that actual

10   check may have been 11/18 but it may have been a

11   different year.

12         Q     Your understanding this being the sale of a

13   Mercedes S430 vehicle?

14         A     I don't remember the model, but it says sale

15   of '05 Mercedes.

16         Q     Did you discuss that with Mr. Eichas?

17               MR. CRANE:  That would be a yes or no

18         question.

19               THE WITNESS:  The answer to that is yes.

20   BY MR. BAKST:

21         Q     What was the substance of that

22   conversation?

23               MR. CRANE:  Object, privilege.

24   BY MR. BAKST:

25         Q     I have a copy of looks to be a title,

1    application for title, in your file on an '04 Ford

2    listing Mr. Cleary as the lien holder.  Let me show this

3    to you.  Actually, some documents from CarMax.  Let me

4    show you this to begin with.  Do you recognize this?

5          A      It was in my file.  I have seen it, but I

6    don't off the top of my head recognize it.

7          Q      Were you ever provided a copy of a promissory

8    note or security agreement between Mr. Eichas and

9    Mr. Cleary?

10         A      I believe I was.

11         Q      Do you know if that would be in your file?

12         A      I'm sure it's either in the file or on one of

13   the disks.

14         Q      Did you prepare any of those documents?

15         A      No.

16         Q      Let me show you a letter from Paul Aragona.

17   Do you recognize this?  It was in your file.

18         A      This was a letter -- based on the fax at the

19   top, the trustee asked for information, I believe I

20   contacted Mr. Rider directly, and he sent me a fax of

21   information which was then turned over to either you or

22   the trustee at the time.  I don't recall.

23         Q      There appears to be a letter to Mr. Rider.

24   Do you know who that is?

25         A      My recollection is that Mr. Rider was

1    Mr. Aragona's attorney.

2         Q      Who is Mr. Aragona?

3         A      Mr. Aragona is someone that had an interest

4    in Avon Park in one of Terry's properties.  I don't know

5    if it was by way of co-owner or mortgage holder.  I don't

6    recall.

7         Q      Did you ever discuss this letter with

8    Mr. Aragona?

9         A      I have never spoken with Mr. Aragona.

10        Q      How about Mr. Rider?

11        A      I don't recall whether I spoke with him or we

12   sent e-mails back and forth.

13        Q      This seems to be saying, part of it, Terry

14   stated that he will definitely be going bankrupt.  This

15   is January '09.  Had a decision been made as of that date

16   to file this bankruptcy?

17        A      I believe he had, yes.

18        Q      Why did you wait then until June to file the

19   case?

20             MR. CRANE:  Objection, privilege.

21   BY MR. BAKST:

22        Q      What is Mr. Aragona's relationship to Mr.

23   Eichas?

24        A      I don't recall.  I remember some people were

25   investors, some people were friends.  I don't recall.

1      Q      Is this your only copy of this letter?

2      A      That is my original file so that is my copy

3    of that, yes.

4             MR. BAKST:   We are going to make this Exhibit

5         2.  We will copy it and give you back your original

6         today.

7             (Whereupon, Trustee's Exhibit Number 2 was

8         marked for identification.)

9    BY MR. BAKST:

10     Q      I'm going to show you the Bar file.  Would

11   you just identify it and tell me if this is a true and

12   correct copy of what it appears to be?

13     A      This is -- this file contains copies of

14   papers that were filed by and against me in The Florida

15   Bar or from The Florida Bar in the complaint from

16   Mr. Eichas.

17     Q      Is this a true and correct copy?

18     A      Yes, it is.

19     Q      I'm looking at the letter from Mr. Eichas to

20   the Bar.  Mr. Eichas claims that more than half of the

21   complaints, referring to the complaint objecting to

22   discharge, have to do with the inappropriate filing of

23   the petition and statement of financial affairs.  What is

24   your understanding as to what he means by the

25   inappropriate filing of the petition?

1      A      I don't know.

2      Q      It says, "I honestly can say today I still do

3   not have a good understanding of these forms and question

4   how much is expected of a lay person filing for

5   bankruptcy.  I did indeed hire an attorney to help me

6   with these exact issues."

7           You represented him throughout the process,

8   isn't that correct, the first meeting up and through the

9   filing of this case; correct?

10     A      Excuse me?

11     Q      Up until the first meeting when you first met

12  with him until he filed this case; correct?

13     A      Yes, and for a little time after, yes.

14     Q      Did he ever tell you he did not have a good

15  understanding of what these forms meant?

16          MR. CRANE:  Objection, privilege.

17          MR. BAKST:  Well, I'm trying to figure out --

18          this is in his letter to the Bar, Mr. Eichas's

19          letter to the Bar, and he is stating, "I still do

20          not have a good understanding of these forms and

21          question how much is expected of a lay person

22          filing for bankruptcy."

23          MR. CRANE:  I understand.  I'm trying to

24          figure out how that waives conversations between

25          him and Mr. Goerke.  If you are asking him solely

1          did Mr. Eichas complain to him that he didn't

2          understand the forms, I guess the privilege is

3          waived to that extent.

4    BY MR. BAKST:

5          Q    Okay.  Then I'm asking, did he ever tell you

6    he did not have a good understanding of these forms?

7          A    I seem to recall that either the day you took

8    the deposition or within a day or two of that, he claimed

9    that he didn't understand the forms or at least one

10   question.

11         Q    Any time prior to that, did he ever tell you

12   he did not have a good understanding of what the forms

13   meant?

14         A    No.

15         Q    He claims here, "My attorney had not even

16   asked for bank statements, ledgers or any of the items

17   requested by the trustee's attorney."  Is that true?

18         A    No.  I mean there is mandatory requirements.

19   I got the mandatory documents.  I didn't ask for years in

20   advance.  I didn't go into that, no.

21         Q    It states, "It seems like I was offered up

22   for a practice run of first year students studying to

23   become legal professionals.  I remember back at my

24   attorney's office when he filled out those forms on the

25   computer.  We spoke for about an hour while preparing

1    that form."

2           Is that how you did prepare the form was on

3    the computer in your office?

4        A    I personally prepared the thing, the papers,

5    on my computer over a period of time, yes.

6        Q    He claims here, "I had told him about the

7    truck being given back to the lien holder and he had no

8    problem with that until after it was done.  He never

9    questioned me about any other vehicles I had or any in

10   depth questions concerning the race horses I owned or

11   worked with."  That's what he states to the Bar.

12          Let me ask you to start.  It says he told you

13   about the truck being given back to the lien holder.  Is

14   that true?

15       A    Well, we discussed that he told me he was

16   going to give Jack the truck back.

17       Q    He states that, "He had no problem with that

18   until after it was done."  What is the problem that arose

19   with that after it was done?

20       A    I found out in --

21          MR. CRANE:  I think --

22          THE WITNESS:  This is an accusation against

23       me.  I may be able to answer.  Well, go ahead.  Do

24       you want to raise an objection to this because I

25       don't want to step over the line if the judge wants

1          to make a ruling on that.

2                    MR. CRANE:  Read the last question back.

3                    (Whereupon, the requested portion was read

4          back by the court reporter.)

5                    MR. CRANE:  On that, I'm going to assert the

6          privilege.  I'll let the judge decide.

7     BY MR. BAKST:

8          Q     He claims here, "He never questioned me about

9     any other vehicles I had."  Is that true?

10         A     We went through the schedules, the vehicles.

11    I asked him about the vehicles and transfers.  We

12    discussed transfers, and we certainly would have

13    discussed fraudulent conveyances.

14         Q     So that's not true; you did discuss with him

15    about vehicles?

16         A     One of the questions is do you have any

17    vehicles.  One of the questions is did you transfer any

18    property.  Yes, those questions were discussed.

19         Q     Did you discuss with him prior to the

20    bankruptcy filing the sale of the Mercedes vehicle?

21         A     If we discussed anything, it's in the

22    schedules.  Something tells me the Mercedes wasn't sold

23    in '08.  That's in my head that there was an error on the

24    date or something.  That's something that didn't happen

25    within the year of filing.  I seem to remember having a

1  discussion.  If that were the case, then it's something I

2  would have discussed because it would have been in the

3  schedules.

4       Q    From what we have seen, the transfer occurred

5  November 17, '07.  This case was filed June of '09.

6  Question ten goes back two years.  I mean are you telling

7  me based on that -- I mean since it's not on the original

8  statement of financial affairs, is it your belief that it

9  was or was not discussed before the bankruptcy filing?

10      A    I discussed the question, okay.  If he told

11  me that -- the question number ten other transfers we

12  discussed did you transfer any property.  We discussed

13  the difference between what a corporation owns and what

14  an individual owns.  And if he told me -- if the answer

15  was he told me about the car, the car would be in number

16  ten.

17      Q    It states here, he never questioned me about

18  any other vehicles I had comma or any in depth questions

19  concerning the race horses I owned or worked with.  Is

20  that correct?

21      A    I recall asking him if he had owned any

22  horses when preparing the schedules.  I don't remember

23  specifically asking him if he transferred any horses in

24  the last four years.  I was told there were no horses.

25  We discussed transfers.  I did not specifically say, did

1    you sell any horses because I didn't realize he was

2    owning horses.

3        Q    Did he tell you that he had sold horses?

4        A    Not at that time.  I didn't realize that he

5    was in buying and selling horses.  I believed him to be a

6    jockey and someone that took care of horses.

7        Q    You had an attorney prepare a response to

8    this which went to The Florida Bar and to which then

9    Mr. Eichas provided an additional response.  He claims

10   that you failed to advise him of the meaning of an asset

11   as it is defined in the context of a bankruptcy.  Is that

12   true?

13       A    I never had to give a definition because

14   Terry is extremely smart and a businessman.  There was

15   never any indication in my mind that there was a reason

16   to define asset anything other than the common knowledge

17   of what asset means.

18       Q    It says you failed to inquire about my prior

19   transfer of assets.  Is that true?

20       A    No.  We discussed question number ten and how

21   we had to answer it.

22       Q    It says, and he failed to explain to me that

23   my prior transfer of assets could be an issue in the

24   bankruptcy.  Is that true?

25       A    I didn't know of any prior transfer of

assets.  We discussed the question.  It was never told.
I'm sure without a doubt we discussed the transfers not
only number ten but the import of fraudulent
conveyances.

    Q    He claims to The Florida Bar, "Mr. Goerke did
know about the situation with the truck and my brother
but didn't seem to be too concerned about it until a
question was raised about it by the trustee."  Is that
true?

    A    That sentence is misleading because there
were different phases of the truck including a phase you
don't know about.  So in answer to that particular
allegation that I knew about the truck, I was told he
gave the truck to Jack.  I was told the new truck was his
brother's and then after that, I was explained the
process.

    Q    You say the process.

    A    Well, again, that comes back to I was --
since we're talking about that particular issue, the
issue with the truck, because you have seen the e-mail
already where he is still saying Jack didn't know where
the truck was.  In response to that after that, I was
told in that particular -- again, there were stages.
There was he gave the truck back, he was using his
brother's truck, and then the e-mail that he doesn't know

1   what Jack did with the truck when we were trying to find
2   stuff out.   And then I was told --
3            MR. CRANE:   Before you say I was told, let's
4        go back to the question and in the letter to the
5        Bar, are you suggesting his waiving what happened
6        after the -- I think you said that he was told that
7        the car was on the schedules, that there was a lien
8        put on the car, that there was a -- the car was
9        returned to the lien holder, and then the question
10       then becomes after that, what happened to the car.
11       What in the letter waives what happened?
12           MR. BAKST:   For him, it's Mr. Goerke did know
13       about the situation with the truck and my brother.
14       So there is a situation with the truck and his
15       brother he is bringing to the Bar's attention, and
16       I can look at Mr. Goerke's attorney's letter which
17       is raised with the Bar so it's all public record.
18       "Mr. Eichas asserts that one of the problems that
19       arose had to do with a truck that he allegedly
20       returned to the lien holder.   Prior to the filing
21       of the bankruptcy, Mr. Eichas told Mr. Goerke that
22       he wanted to return the truck to the person who
23       held the lien on the truck.   Mr. Goerke said that
24       he could return the truck to the lien holder.
25       Based solely upon the information provided by

1    Mr. Eichas, the voluntary repossession was revealed

2    in the bankruptcy petition.  However, Mr. Eichas

3    had not told Mr. Goerke the truth about the truck.

4    In reality, as later discovered by the trustee and

5    raised as an issue in the adversary proceeding,

6    Mr. Eichas secured a release from the lien holder

7    and used the truck as a down payment for the

8    purchase of a replacement vehicle that he put in

9    his brother's name.  Mr. Eichas drove this new

10   vehicle and provided cash to his brother to make

11   payments on the vehicle.  None of the true story

12   was revealed to Mr. Goerke until after the

13   bankruptcy was filed.  Had Mr. Goerke been informed

14   of this subterfuge, he would have told his client

15   that it was improper and made sure that the new

16   vehicle was properly disclosed and listed."  That's

17   in response.

18        Mr. Eichas in his letter states, "Mr. Goerke

19   did know about the situation with the truck and my

20   brother."

21        So apparently Mr. Eichas thinks Mr. Goerke

22   knew all about this all along, and that's what I'm

23   trying to find out.

24        MR. CRANE:  Off the record for a minute

25   please so I can talk to my client.

1          MR. BAKST:   Okay.

2          (Whereupon, a short recess was taken.)

3          MR. CRANE:   I think based upon that, that

4      Mr. Eichas waived it, not to suggest that I'm

5      waiving it, but that I believe that it has been

6      waived.

7          MR. BAKST:   So he can answer the question.

8          MR. CRANE:   Can you re-read the question.

9          (Whereupon, the requested portion was read

10      back by the court reporter.)

11  BY MR. BAKST:

12      Q    Do you understand generally what the question

13  was?

14      A    No, I don't.

15      Q    I made a statement that apparently the debtor

16  was claiming you knew the situation with the truck and

17  his brother and you weren't too concerned about it.  I

18  read from your attorney's letter to The Florida Bar and

19  generally explained the situation.  And I'm asking you if

20  you can respond to that, particularly the debtor saying

21  you knew about the situation with the truck and his

22  brother?

23      A    As I said before, there were stages with the

24  truck, gave Jack the truck back, I said that's fine.

25  Then I saw him driving a truck, and he said it was his

1    brother's truck.  And then subsequent to that, we had the

2    conversation that is outlined in the letter.

3         Q     Explain it to me please.  Tell me what

4    happened.

5         A     I -- we needed to amend the schedules.  So we

6    decided to amend the schedules.  We talked about various

7    issues.  One of the issues that came up was the vehicle,

8    this particular vehicle, and then he told me that despite

9    the e-mail where he tells me that he doesn't know what

10   Jack did with it, that Jack actually signed a release.

11   And I believe he said that he actually went to the

12   dealer, they traded that truck in and purchased another

13   one in his brother's name.

14        Q     Went to the dealer with Jack?

15        A     I believe Terry told me -- I recall Terry

16   telling me that -- no.  Jack wasn't there.  He didn't go

17   there with Jack.  Jack had given him the release in

18   advance.  Then he went to the dealership himself.  I

19   don't remember if he -- he must have went with his

20   brother if they bought a truck in his name, but I don't

21   recall him saying he went with anyone other than he had

22   gotten a release and went to the dealer.

23        Q     And then what happened?

24        A     They bought a new truck.

25        Q     Under his brother's name?

1       A       I never saw anything that says whose name

2   the new truck is in, but it's my understanding that he

3   bought a truck in his brother's name.  And I don't know

4   which brother.  I just know that that's what I was

5   told.

6       Q       Did you ask him why he did that?

7       A       No.  I wasn't happy to find out about that.

8   Okay.  That was part of -- that's part of why -- well, I

9   can't go there.  But I mean we get into discussions about

10  various things but that was it.

11      Q       When you say various things, before we know

12  if it's privileged, I need to know is it discussion

13  relating to what happened with the truck?

14      A       We had discussions regarding the truck, and I

15  was not happy.

16      Q       Why weren't you happy?

17      A       Because that's not what I was told.

18      Q       You were told what?

19      A       I'm going to give the truck back to Jack, and

20  he told me he gave the truck back to Jack.

21      Q       And you later found out that wasn't true?

22      A       To be honest with you, I don't know if it's

23  true or not true.  I never saw any documentation.  I'm

24  just telling you what I was told by Terry as to what

25  really happened.

1   Q  It says here, "Mr. Eichas drove this new

2 vehicle and provided cash to his brother to make payments

3 on the vehicle."

4     How do you know he provided cash to his

5 brother to make payments on the vehicle?

6   A  I should clarify that I saw him driving a new

7 vehicle.  Whether it was the one that was involved with

8 this, I don't know.  Any statement about providing cash

9 was him telling me he was paying his brother for payments

10 on the truck.

11   Q  Did you ask him why?

12   A  I didn't get into the truck apart from saying

13 that it was a big issue.

14   Q  Was there an amendment filed to disclose this

15 transaction?

16   A  We discussed the possibility of amending.  No

17 amendment was filed.

18   Q  Why not?

19     MR. CRANE:  Objection, privilege.

20 BY MR. BAKST:

21   Q  Well, does it have anything to do with the

22 situation involving the truck as to why an amendment was

23 not filed?

24   A  The answer to that is it's hard to say.

25 There were multiple issues.

1          Q        Involving the truck or something else?

2                   MR. CRANE:  Well, I'm going to interject

3          for a second because it sounds like the multiple

4          issues with the truck as the witness explained it

5          were the phases which is the situation being the

6          return of the vehicle to Mr. Cleary or the lien

7          being put on the vehicle to Mr. Cleary which was

8          disclosed, the surrender of the vehicle to

9          Mr. Cleary, the subsequent disposal of the vehicle

10         or trade in or whatever it is and however you want

11         to phrase that, and that sounds like that's what

12         the situation is.

13                   I think it's outside of that situation as

14         to whether or not there would be an amendment or

15         not or what the reasons for not amending the -- I

16         don't believe -- I believe that the -- what sounds

17         like he's about to testify to is the reasons for

18         amending or not amending were beyond those three

19         sort of steps which he said was the situation with

20         the truck.  So I don't believe that that provision

21         in the letter to the Bar has to do with amendments

22         or not.  And so therefore I think the privilege

23         still stands.

24    BY MR. BAKST:

25         Q        He states in his letter, he being Mr. Eichas,

1    "He mentions an amendment to the filing which I was fine

2    with, however, that never transpired.  It always seemed

3    like it would be too much work to do the amendment and

4    the letter he wrote was the only one presented to the

5    trustee and that went without response."

6              It appears he raised this issue with The

7    Florida Bar.  Was it too much work for you to do an

8    amendment?  Is that why no amendments were filed?

9         A    Back then I spent a lot of time on Terry's

10   case.  I wanted his case to get through.  We met

11   extensively, I'm talking about hours, about possible

12   amendments.

13             There were issues in addition to the vehicle

14   that had to be addressed.  And the answer to that was

15   because of what he was telling me, I recommended that he

16   go see Robert Furr.

17        Q    He mentions an amendment to the filing which

18   I was fine with, however, that never transpired, reading

19   from his letter.  What was the amendment that he was fine

20   with?

21        A    He was okay with amending the schedules, but

22   I didn't believe that the amendment that he anticipated

23   was the amendment that had to be done.

24        Q    What was the amendment that he was fine

25   with?

1          A      The answer to that is there was no specific

2      amendment.   There were issues that were being raised that

3      we had talked about, and we have talked about some of

4      them already, being the car and the horses.   There are

5      additional issues.

6          Q      Were those part of amendments that you had

7      prepared to file?

8          A      We never finalized the amendments because I

9      could never get a clear understanding of what amendments

10     had to be made.

11         Q      Reading from your attorney's letter,

12     "Mr. Goerke communicated with Mr. Eichas extensively

13     about the possibility of filing amendments to Mr.

14     Eichas's bankruptcy schedules and statement of financial

15     affairs.   Unfortunately, these discussions only uncovered

16     more and more assets and asset transfers which were not

17     revealed to Mr. Goerke and not disclosed in Mr. Eichas's

18     bankruptcy filing.   Any amendment filed with the

19     bankruptcy court was required to be verified by

20     Mr. Eichas and if filed by Mr. Goerke, would be required

21     to include all information which Mr. Eichas revealed to

22     Mr. Goerke subsequent to the filing of the bankruptcy but

23     prior to the date of the amendment.   Included in this

24     information would be matters not known to the trustee and

25     not the subject of the adversary proceeding so that had

NES

```
 1    Mr. Eichas filed amendments to his bankruptcy schedules
 2    and statement of financial affairs which truly and
 3    accurately portrayed his financial status, the falsity of
 4    the original bankruptcy filing would have been even more
 5    pronounced."  What do you mean by that?
 6              MR. CRANE:  On that, I raise the privilege
 7         and have the judge decide on that one.
 8    BY MR. BAKST:
 9         Q    Let me ask was a draft amendment ever
10    prepared that would have listed all of this
11    information?
12         A    The answer is I don't recall doing a draft
13    amendment.  I recall meeting with him one particular
14    meeting that lasted a good three hours where we went over
15    various items, and that's the one referenced by the horse
16    e-mail.  And the answer was my ultimate resolution was
17    for him to go see Robert Furr.
18              MR. BAKST:  I'm going to show you what I'm
19         going to mark next.  We are up to Exhibit 4.  Three
20         is going to be the Bar file.  Four is going to be
21         Court Paper 10 in the adversary proceeding ending
22         2182.  I have a copy for Mr. Crane.
23              (Whereupon, Trustee's Exhibit Numbers 3 and
24         4 were marked for identification.)
25
```

1    BY MR. BAKST:

2        Q       Have you ever seen this before?

3        A       I did review this when the Bar complaint

4    came, yes.  I don't remember it, but I do remember that I

5    did go on the PACER and pull out a copy of this answer.

6        Q       Did you ever discuss it with Mr. Eichas?

7        A       No.  We were not talking by that time

8    although my telephone log shows he made calls to my

9    office in January, but I never spoke with him.

10       Q       Let's go through these letters to the court.

11   Paragraph starting, "I supplied him", do you see that

12   near the bottom?

13       A       Okay, yes.

14       Q       "What surprises me now is that he never asked

15   for the bank statements and tax returns for me or any of

16   my businesses."  Is that true?

17       A       I asked for the required tax returns, yes,

18   and I was provided them and the trustee was provided

19   them.  In fact, we got the tax returns for the business,

20   yes, but that would have been two years tax returns.

21       Q       How about bank statements?

22       A       I got six months bank statements on his

23   personal account, the horse account, and the Homes of

24   Distinction account.

25       Q       It says, "Then there were the forms.  It took

1  a little less than one hour in the attorney's office for

2  him to fill out the computer generated forms to complete

3  bankruptcy."  Is that the total amount of time you

4  spent?

5       A    On the final meeting, yes.  There were many,

6  many hours put into preparing his schedules.

7       Q    He claims on the next page, number six, "The

8  2004 Ford pick up was appraised at CarMax in the amount

9  of eight thousand dollars in May 2009 to establish the

10  value of the vehicle.  I then signed the title for

11  Mr. Cleary and dropped the truck off at a Ford dealership

12  as stated in the deposition."  Is that what he told

13  you?

14       A    My recollection is what I told -- is what is

15  put in the response to the Bar complaint.  I don't --

16  let's see.  I then signed the title for Mr. Cleary.  I

17  seem to recall that Mr. Cleary was quite ill, and he told

18  me he was quite ill, and couldn't even get around, but I

19  was told that Mr. Cleary signed a release and then Mr.

20  Eichas went to the dealership.

21       Q    He said he dropped off the truck at the

22  dealership.  From what he told you, he didn't drop it

23  off, he traded it in and got a truck under his brother's

24  name; is that correct?

25       A    Again, the time frame.  After the filing when

1    we had a discussion, I was told that he was provided with

2    a release and that he went to the dealership, that Jack

3    was not there.

4         Q      But he admitted to you that he went to the

5    dealership with the truck and got a new truck under his

6    brother's name?

7         A      That's what he told me, yes.

8              MR. BAKST:   I'll make this Exhibit Number 5.

9              (Whereupon, Trustee's Exhibit Number 5 was

10       marked for identification.)

11   BY MR. BAKST:

12        Q      Do you recognize this?  There is a copy for

13   Mr. Crane.  Have you ever seen this before?

14        A      I don't remember if we saw this.  I can't

15   sitting here today know whether I looked this up or not.

16   When the Bar complaint was filed, whatever date that was,

17   I went on PACER to find out what Terry had filed.  So

18   whether I did this or not, I don't have a particular

19   recollection.

20        Q      He seems to be saying here if we look at the

21   second paragraph, "As stated in the rule 2004

22   examination, the 2004 truck was taken to CarMax only for

23   a price evaluation and then taken to the Ford dealership

24   by the defendant."  I guess referring to himself.  "A

25   reference to the court reporter would rebut the

1   allegation that the truck was sold to CarMax as stated by

2   plaintiff's counsel.  It is also apparent that the lien

3   on the vehicle registered with the Department of Motor

4   Vehicles by Mr. John P. Cleary, Jr. has been disregarded

5   completely and that the vehicle was signed over to him as

6   a cause of this lien."

7          Did he tell you that he signed the vehicle

8   over to Mr. Cleary?

9      A     Two different conversations.  In a later

10  conversation, I was told that Mr. Cleary executed a

11  waiver.  I don't know if that's true or not.  I assume

12  you would know more than I.

13      Q     Then it says, "It was entirely Mr. Cleary's

14  prerogative to do with the vehicle as he so chose."  He

15  didn't tell you that Mr. Cleary is the person that traded

16  in this car, did he?

17          MR. CRANE:  Objection to form.

18  BY MR. BAKST:

19      Q     Did he tell you that Mr. Cleary traded in

20  this vehicle?

21      A     He never at any time said Mr. Cleary traded

22  in the vehicle.  Let me correct that.  There was that one

23  e-mail, remember the one e-mail we talked about, where he

24  said, I don't know what Jack did with the truck.  That's

25  the only thing he would have said about Jack having the

1    truck.  I seem to remember an exhibit about a Ford

2    something or other.  That e-mail was sent to me in that

3    capacity, and that's what I remember.

4         Q      Do you know who Jian, J-i-a-n, Zhen, Z-h-e-n,

5    is?

6         A      What was that?

7         Q      The first word Jian, J-i-a-n, next word Zhen,

8    Z-h-e-n.  Do you know who that person is?

9         A      Something tells me I have seen the name

10   before, but I couldn't tell you who it is.

11        Q      Were you aware of the transfer of real

12   property 2650 Mulberry Road that was transferred in

13   January of '09?  Were you aware of that transfer prior to

14   the bankruptcy filing?

15        A      There was a transfer of property I thought

16   that we -- this is what was -- the transfer -- if there

17   was a transfer of property and we discussed that, I would

18   have put it in number ten.  I'm not sure what property

19   that was that you are talking about.  There were

20   multiple -- I think Mulberry Road there was more than one

21   property.

22        Q      We have marked what we can mark for today.

23   Unfortunately, I can't complete the deposition today

24   because there are many documents that have been claimed

25   as privileged.

```
 1              Now I'm reading from Mr. Eichas's deposition
 2    of April 22, 2010, page twenty-eight, line seventeen,
 3    "Question:  How come" -- I'll go back.  Go to line eleven
 4    so it's more in context.  "Question:  Why didn't you list
 5    that?"  Let me go back further.  Well, I can tell you
 6    it's referring to --
 7              MR. CRANE:  This is the 7030 or 2004?
 8              MR. BAKST:  7030.
 9    BY MR. BAKST:
10        Q     Let me read it to you.
11              "Question:  Why didn't you list that?
12              "Answer:  I did not transfer the truck to
13              Wayne Akers.
14              "Question:  Is it true that on or around
15              April 2009, you transferred a horse to
16              Jasmine Gannen for four thousand seven
17              hundred dollars?
18              "Answer:  That is correct.
19              "Question:  How come that transfer wasn't
20              listed on your schedules or statement of
21              financial affairs?
22              "Answer:  To the best of my understanding
23              through counsel, that exchange of horses and
24              exchange of real estate were in the normal
25              daily business of what I did to produce
```

1          income."

2               Did you have any discussions with Mr. Eichas

3     about the normal daily business of what he did to produce

4     income as being a reason not to list a transfer of horses

5     or real estate?

6          A     It was the time frame.  Okay.  Again, I was

7     told he owned no horses.  I didn't ask him whether he

8     transferred horses specifically over the last two

9     years in response to number ten.  I never told him not to

10    list any transfers of horses because I didn't know about

11    them.

12              Subsequent to that, we had discussions about

13    what that question means to which I said, well, we will

14    look at making an amendment.  It seems to me that you

15    have some confusion about what the ordinary course of

16    business is.

17              And that was before the first deposition

18    where he came in and gave that bizarre answer.  But, yes,

19    we discussed that subsequently about being able to amend

20    based on innocent error on his misunderstanding.  But I

21    never told him that he didn't have to list any transfers

22    of horses because I didn't know about them.

23         Q     Page twenty-nine, line three, "Question:  Why

24    was this transfer not listed anywhere on your schedules

25    or statement of financial affairs?"

1        It was referring to the ten thousand dollars

2   that was transferred -- I'm sorry -- the interest in

3   GJTT, LLC that went Jian Zhen for ten thousand dollars.

4        His answer to that question was, "That

5   transfer like the other real estate transfers according

6   to the counsel preparing the bankruptcy was our

7   understanding that it was part of the daily activities of

8   business, of normal business."

9        Is that true?

10      A    We never specifically talked about -- we

11  talked about the difference between a transfer within a

12  corporation and what corporation assets was and what

13  was his personally.  We talked about the need to list

14  assets and transfers.  Okay.  I never -- we didn't

15  discuss the sale of those shares because I was not told

16  about it.

17       But, again, subsequent to that prior to

18  the first deposition, we talked about, well, I can

19  see where it was an innocent error and just confirm

20  that you thought it was in the ordinary course of

21  business.

22      Q    But those amendments were not filed, were

23  they?

24      A    They were not filed, no.

25           MR. BAKST:  We will convene for today

1          unless Mr. Crane has questions and at some point,

2          we may reconvene once there is a ruling by the

3          court on the documents that are claimed as

4          privileged today.  What I need to get back to you

5          today is Number 2.

6                THE WITNESS:  Are you going to make a copy of

7          that?

8                MR. CRANE:  Before you start, I have one or

9          two questions and then I'm going to reserve the

10         rest until after the judge rules.

11                           CROSS EXAMINATION

12    BY MR. CRANE:

13         Q     You had testified earlier about what your

14    understanding was in question ten.  How far back does --

15    and I guess when you were filling these schedules out in

16    2009, how far back did you understand at that time a

17    transfer had to be for it to be listed?

18         A     There is a two-part answer because the

19    question to be listed, it has to be within two years of

20    the filing, but we always talked about four years because

21    you have the two-year and the four-year as far as

22    conveyance.  So we talked about as far as listing, it's

23    my understanding two years prior to the date of filing is

24    the proper term.

25         Q     It sounded like earlier you said one year?

1         A       Whatever the question says, all right.  I

2    don't have it in front of me.  As I'm sitting here, I

3    can't recite it, but I believe the transfer -- whatever

4    the number is in the schedules is what was discussed and

5    required.  I didn't alter the question.

6              MR. CRANE:  All right.  That's it for now.

7              MR. BAKST:  Let's make sure we are clear as

8         far as documents.  I think you were going to take

9         that group, is that right, or you are taking it or

10        he's taking it?

11             MR. CRANE:  He's taking it.  We are going to

12        put it into a --

13             MR. BAKST:  Here is an envelope.  And we have

14        this stack, let's see if it will fit into multiple

15        envelopes, which is not privileged.  I'll put the

16        rest of these in multiple envelopes and number

17        them.  I guess we will have the same copy service,

18        if you will, have them make a copy.  Mine it's okay

19        if it's on disk.

20             MR. CRANE:  For those documents, they can be

21        on a disk.  I think these documents can't be.

22             MR. BAKST:  The judge will have to review

23        it.

24             MR. CRANE:  If you want to try it that way, I

25        am willing.

1          MR. BAKST:   Anyway, I think we are clear

2     enough on what we are doing about the documents.

3     Is it okay if we go off the record?

4          MR. CRANE:   Yes.

5          (Whereupon, the deposition was adjourned.)

1                        CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4            I, the undersigned authority, certify that

5    STEVEN G. GOERKE personally appeared before me and was

6    duly sworn.

7            WITNESS my hand and official seal the

8    _____5____ day of _____August_____, 2010.

9

10               *Janice L. Mamino*

11               JANICE L. MAMINO

12

13                              JANICE L. MAMINO
                                MY COMMISSION # DD 919678
14                              EXPIRES: December 21, 2013
                                Bonded Thru Notary Public Underwriters
15

16

17

18

19

20

21

22

23

24

25

                              CERTIFICATE

1

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4         I, Janice L. Mamino, certify that I was authorized

5    to and did stenographically report the deposition of

6    STEVEN G. GOERKE; that a review of the transcript was not

7    requested; and that the transcript is a true and complete

8    record of my stenographic notes.

9         I further certify that I am not a relative,

10   employee, attorney, or counsel of any of the parties, nor

11   am I a relative or employee of any of the parties'

12   attorney or counsel connected with the action, nor am I

13   financially interested in the action.

14        Dated this ____5____ day of *August*            ,

15   2010.

16

17

18                    *Janice L. Mamino*

19                    JANICE L. MAMINO

20

21

22

23

24

25